## SLAUGHTER-HOUSE CASES.

THE BUTCHERS' BENEVOLENT ASSOCIATION OF NEW ORLEANS. v. THE CRESCENT CITY LIVE-STOCK LANDING AND SLAUGHTER-HOUSE COMPANY.

PAUL ESTEBEN, L. RUCH, J. P. ROUEDE, W. MAYLIE, S. FIRMBERG, B. BEAUBAY, WILLIAM FAGAN, J. D. BRODERIOK, N. SEIBEL, M. LANNES, J. GITZINGER, J. P. AYCOCK, D. VERGES, THE LIVE-STOCK DEALERS' AND BUTCHERS' ASSOCIATION OF NEW ORLEANS, AND CHARLES CAVAROC v. THE STATE OF LOUISIANA, ex rel. S. BELDEN, ATTORNEY-GENERAL.

THE BUTCHERS' BENEVOLENT ASSOCIATION OF NEW ORLEANS v. THE CRESCENT CITY LIVE-STOCK LANDING AND SLAUGHTER-HOUSE COMPANY.

1. The legislature of Louisiana, on the 8th of March, 1869, passed an act granting to a corporation, created by it, the exclusive right, for twenty-five years, to have and maintain slaughter-houses, landings for cattle, and yards for inclosing cattle intended for sale or slaughter within the parishes of Orleans, Jefferson, and St. Bernard, in that State (a territory which, it was said,—see *infra*, p. 85,—contained 1154 square miles, including the city of New Orleans, and a population of between two and three hundred thousand people), and prohibiting all other persons from building, keeping, or having slaughter-houses, landings for cattle, and yards for cattle intended for sale or slaughter, within those limits; and requiring that all cattle and other animals intended for sale or slaughter in that district, should be brought to the yards and slaughter-houses of the corporation; and authorizing the corporation to exact certain prescribed fees for the use of its wharves and for each animal landed, and certain prescribed fees for each animal slaughtered, besides the head, feet, gore, and entrails, except of swine : *Held*, that this grant of exclusive right or privilege, guarded by proper limitation of the prices to be charged, and imposing the duty of providing ample conveniences, with permission to all owners of stock to land, and of all

butchers to slaughter at those places, was a police regulation for the health and comfort of the people (the statute locating them where health and comfort required), within the power of the State legislatures, unaffected by the Constitution of the United States previous to the adoption of the thirteenth and fourteenth articles of amendment.

2. The Parliament of Great Britain and the State legislatures of this country have always exercised the power of granting exclusive rights when they were necessary and proper to effectuate a purpose which had in view the public good, and the power here exercised is of that class, and has until now never been denied.

Such power is not forbidden by the thirteenth article of amendment and by the first section of the fourteenth article. An examination of the history of the causes which led to the adoption of those amendments and of the amendments themselves, demonstrates that the main purpose of all the three last amendments was the freedom of the African race, the security and perpetuation of that freedom, and their protection from the oppressions of the white men who had formerly held them in slavery.

3. In giving construction to any of those articles it is necessary to keep this main purpose steadily in view, though the letter and spirit of those articles must apply to all cases coming within their purview, whether the party concerned be of African descent or not.

While the thirteenth article of amendment was intended primarily to abolish African slavery, it equally forbids Mexican peonage or the Chinese coolie trade, when they amount to slavery or involuntary servitude; and the use of the word "servitude" is intended to prohibit all forms of involuntary slavery of whatever class or name.

The first clause of the fourteenth article was primarily intended to confer citizenship on the negro race, and secondly to give definitions of citizenship of the United States, and citizenship of the States, and it recognizes the distinction between citizenship of a State and citizenship of the United States by those definitions.

The second clause protects from the hostile legislation of the States the privileges and immunities of *citizens of the United States* as distinguished from the privileges and immunities of citizens of the States.

These latter, as defined by Justice Washington in *Corfield* v. *Coryell*, and by this court in *Ward* v. *Maryland*, embrace generally those fundamental civil rights for the security and establishment of which organized society is instituted, and they remain, with certain exceptions mentioned in the Federal Constitution, under the care of the State governments, and of this class are those set up by plaintiffs.

4. The privileges and immunities of citizens of the United States are those which arise out of the nature and essential character of the National government, the provisions of its Constitution, or its laws and treaties made in pursuance thereof; and it is these which are placed under the protection of Congress by this clause of the fourteenth amendment.

It is not necessary to inquire here into the full force of the clause forbidding a State to enforce any law which deprives a person of life, liberty,

or property without due process of law, for that phrase has been often the subject of judicial construction, and is, under no admissible view of it, applicable to the present case.

The clause which forbids a State to deny to any person the equal protection of the laws was clearly intended to prevent the hostile discrimination against the negro race so familiar in the States where he had been a slave, and for this purpose the clause confers ample power in Congress to secure his rights and his equality before the law.

ERROR to the Supreme Court of Louisiana.

The three cases—the parties to which as plaintiffs and defendants in error, are given specifically as a sub-title, at the head of this report, but which are reported together also under the general name which, in common parlance, they had acquired—grew out of an act of the legislature of the State of Louisiana, entitled: "*An act to protect the health of the City of New Orleans, to locate the stock landings and slaughter-houses, and to incorporate ' The Crescent City Live-Stock Landing and Slaughter-House Company,'*" which was approved on the 8th of March, 1869, and went into operation on the 1st of June following; and the three cases were argued together.

The act was as follows:

"SECTION 1. *Be it enacted, &c.,* That from and after the first day of June, A.D. 1869, it shall not be lawful to land, keep, or slaughter any cattle, beeves, calves, sheep, swine, or other animals, or to have, keep, or establish any stock-landing, yards, pens, slaughter-houses, or abattoirs at any point or place within the city of New Orleans, *or the parishes of Orleans, Jefferson, and St. Bernard,* or at any point or place on the *east* bank of the Mississippi River within the corporate limits of the city of New Orleans, or at any point on the west bank of the Mississippi River, above the present depot of the New Orleans, Opelousas, and Great Western Railroad Company, *except* that the 'Crescent City Stock Landing and Slaughter-House Company' may establish *themselves* at any point or place as hereinafter provided. Any person or persons, or corporation or company carrying on any business or doing any act in contravention of this act, or landing, slaughtering or keeping any animal or animals in violation of this act, shall be liable to a fine of $250, for each and

every violation, the same to be recoverable, with costs of suit, before any court of competent jurisdiction."

The second section of the act created one Sanger and sixteen other persons named, a corporation, with the usual privileges of a corporation; and including power to appoint officers, and fix their compensation and term of office, and to fix the amount of the capital stock of the corporation and the number of shares thereof.

The act then went on :

" SECTION 3. *Be it further enacted, &c.*, That said company or corporation is hereby authorized to establish and erect at its own expense, at any point or place on the east bank of the Mississippi River within the parish of St. Bernard, or in the corporate limits of the city of New Orleans, below the United States Barracks, or at any point or place on the west bank of the Mississippi River below the present depot of the New Orleans, Opelousas, and Great Western Railroad Company, wharves, stables, sheds, yards, and buildings necessary to land, stable, shelter, protect, and preserve all kinds of horses, mules, cattle, and other animals; and from and after the time such buildings, yards, &c., are ready and complete for business, and notice thereof is given in the official journal of the State, the said Crescent City Live-Stock Landing and Slaughter-House Company shall have *the sole and exclusive privilege of conducting and carrying on the live-stock landing and slaughter-house business within the limits and privileges granted by the provisions of this act;* and cattle and other animals destined for sale or slaughter in the city of New Orleans, or its environs, shall be landed at the live-stock landings and yards of said company, and shall be yarded, sheltered; and protected, if necessary, by said company or corporation; and said company or corporation shall be entitled to have and receive for each steamship landing at the wharves of the said company or corporation, $10; for each steamboat or other water craft, $5; and for each horse, mule, bull, ox, or cow landed at their wharves, for each and every day kept, 10 cents; for each and every hog, calf, sheep, or goat, for each and every day kept, 5 cents, all without including the feed; and said company or corporation shall be entitled to keep and detain each and all of said animals until said charges are fully paid.   But

if the charges of landing, keeping, and feeding any of the aforesaid animals shall not be paid by the owners thereof after fifteen days of their being landed and placed in the custody of the said company or corporation, then the said company or corporation, in order to reimburse themselves for charges and expenses incurred, shall have power, by resorting to judicial proceedings, to advertise said animals for sale by auction, in any two newspapers published in the city of New Orleans, for five days; and after the expiration of said five days, the said company or corporation may proceed to sell by auction, as advertised, the said animals, and the proceeds of such sales shall be taken by the said company or corporation, and applied to the payment of the charges and expenses aforesaid, and other additional costs; and the balance, if any, remaining from such sales, shall be held to the credit of and paid to the order or receipt of the owner of said animals. Any person or persons, firm or corporation violating any of the provisions of this act, or interfering with the privileges herein granted, or landing, yarding, or keeping any animals in violation of the provisions of this act, or to the injury of said company or corporation, shall be liable to a fine or penalty of $250, to be recovered with costs of suit before any court of competent jurisdiction.

"The company shall, before the first of June, 1869, build and complete A GRAND SLAUGHTER-HOUSE of sufficient capacity to accommodate all butchers, and in which to slaughter 500 animals per day; also a sufficient number of sheds and stables shall be erected before the date aforementioned, to accommodate all the stock received at this port, all of which to be accomplished before the date fixed for the removal of the stock landing, as provided in the first section of this act, under penalty of a forfeiture of their charter.

"SECTION 4. *Be it further enacted, &c.*, That the said company or corporation is hereby authorized to erect, at its own expense, one or more landing-places for live stock, as aforesaid, at any points or places consistent with the provisions of this act, and to have and enjoy from the completion thereof, and after the first day of June, A.D. 1869, *the exclusive privilege of having landed at their wharves or landing-places all animals intended for sale or slaughter in the parishes of Orleans and Jefferson;* and are hereby also authorized (in connection) to erect at its own expense one or more slaughter-houses, at any points or places

consistent with the provisions of this act, and to have and enjoy, from the completion thereof, and after the first day of June, A.D. 1869, *the exclusive privilege of having slaughtered therein all animals, the meat of which is destined for sale in the parishes of Orleans and Jefferson.*

"SECTION 5. *Be it further enacted, &c.,* That whenever said slaughter-houses and accessory buildings shall be completed and thrown open for the use of the public, said company or corporation shall immediately give public notice for thirty days, in the official journal of the State, and within said thirty days' notice, and within, from and after the first day of June, A.D. 1869, *all other stock landings and slaughter-houses within the parishes of Orleans, Jefferson, and St. Bernard shall be closed, and it will no longer be lawful to slaughter cattle, hogs, calves, sheep, or goats, the meat of which is determined for sale within the parishes aforesaid, under a penalty of* $100, *for each and every offence, recoverable, with costs of suit, before any court of competent jurisdiction; that all animals to be slaughtered, the meat whereof is determined for sale in the parishes of Orleans or Jefferson, must be slaughtered in the slaughter-houses erected by the said company or corporation;* and upon a refusal of said company or corporation to allow any animal or animals to be slaughtered after the same has been certified by the inspector, as hereinafter provided, to be fit for human food, the said company or corporation shall be subject to a fine in each case of $250, recoverable, with costs of suit, before any court of competent jurisdiction; said fines and penalties to be paid over to the auditor of public accounts, which sum or sums shall be credited to the educational fund.

"SECTION 6. *Be it further enacted, &c.,* That the governor of the State of Louisiana shall appoint a competent person, clothed with police powers, to act as inspector of all stock that is to be slaughtered, and whose duty it will be to examine closely all animals intended to be slaughtered, to ascertain whether they are sound and fit for human food or not; and if sound and fit for human food, to furnish a certificate stating that fact, to the owners of the animals inspected; and without said certificate no animals can be slaughtered for sale in the slaughter-houses of said company or corporation. The owner of said animals so inspected to pay the inspector 10 cents for each and every animal so inspected, one-half of which fee the said inspector shall retain for his services, and the other half of said fee shall be

paid over to the auditor of public accounts, said payment to be made quarterly. Said inspector shall give a good and sufficient bond to the State, in the sum of $5000, with sureties subject to the approval of the governor of the State of Louisiana, for the faithful performance of his duties. Said inspector shall be fined for dereliction of duty $50 for each neglect. Said inspector may appoint as many deputies as may be necessary. The half of the fees collected as provided above, and paid over to the auditor of public accounts, shall be placed to the credit of the educational fund.

"SECTION 7. *Be it further enacted, &c.,* That all persons slaughtering or causing to be slaughtered, cattle or other animals in said slaughter-houses, shall pay to the said company or corporation the following rates or perquisites, viz.: For all beeves, $1 each; for all hogs and calves, 50 cents each; for all sheep, goats, and lambs, 30 cents each; *and the said company or corporation shall be entitled to the head, feet, gore, and entrails of all animals excepting hogs, entering the slaughter-houses and killed therein,* it being understood that the heart and liver are not considered as a part of the gore and entrails, and that the said heart and liver of all animals slaughtered in the slaughter-houses of the said company or corporation shall belong, in all cases, to the owners of the animals slaughtered.

"SECTION 8. *Be it further enacted, &c.,* That all the fines and penalties incurred for violations of this act shall be recoverable in a civil suit before any court of competent jurisdiction, said suit to be brought and prosecuted by said company or corporation in all cases where the privileges granted to the said company or corporation by the provisions of this act are violated or interfered with; that one-half of all the fines and penalties recovered by the said company or corporation [*Sic* in copy—REP.], in consideration of their prosecuting the violation of this act, and the other half shall be paid over to the auditor of public accounts, to the credit of the educational fund.

"SECTION 9. *Be it further enacted, &c.,* That said Crescent City Live-Stock Landing and Slaughter-House Company shall have the right to construct a railroad from their buildings to the limits of the city of New Orleans, and shall have the right to run cars thereon, drawn by horses or other locomotive power, as they may see fit; said railroad to be built on either of the public roads running along the levee on each side of the Mississippi

River. The said company or corporation shall also have the right to establish such steam ferries as they may see fit to run on the Mississippi River between their buildings and any points or places on either side of said river.

"SECTION 10. *Be it further enacted, &c.,* That at the expiration of twenty-five years from and after the passage of this act the privileges herein granted shall expire."

The parish of Orleans containing (as was said*) an area of 150 square miles; the parish of Jefferson of 384; and the parish of St. Bernard of 620; the three parishes together 1154 square miles, and they having between two and three hundred thousand people resident therein, and prior to the passage of the act above quoted, about 1000 persons employed daily in the business of procuring, preparing, and selling animal food, the passage of the act necessarily produced great feeling. Some hundreds of suits were brought on the one side or on the other; the butchers, not included in the "monopoly" as it was called, acting sometimes in combinations, in corporations, and companies, and sometimes by themselves; the same counsel, however, apparently representing pretty much all of them. The ground of the opposition to the slaughter-house company's pretensions, so far as any cases were finally passed on in this court was, that the act of the Louisiana legislature made a monopoly and was a violation of the most important provisions of the thirteenth and fourteenth Articles of Amendment to the Constitution of the United States. The language relied on of these articles is thus:

#### AMENDMENT XIII.

"Neither slavery nor *involuntary servitude* except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, nor any place subject to their jurisdiction."

#### AMENDMENT XIV.

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, *are citizens of the United States* and of the State wherein they reside.

* See *infra,* pp. 85, 86.

Argument against the monopoly.

" No State shall make or enforce any law which shall abridge the *privileges or immunities of citizens of the United States,* nor shall any State deprive any person of life, *liberty, or property,* without due process of law; nor deny to any person within its jurisdiction the *equal protection of the laws."*

The Supreme Court of Louisiana decided in favor of the company, and five of the cases came into this court under the 25th section of the Judiciary Act in December, 1870; where they were the subject of a preliminary motion by the plaintiffs in error for an order in the nature of a supersedeas. After this, that is to say, in March, 1871, a compromise was sought to be effected, and certain parties professing, apparently, to act in a representative way in behalf of the opponents to the company, referring to a compromise that they assumed had been effected, agreed to discontinue " *all* writs of error concerning the said company, now pending in the Supreme Court of the United States;" stipulating further " that their agreement should be sufficient authority for any attorney to appear and move for the dismissal of *all* said suits." Some of the cases were thus confessedly dismissed. But the three of which the names are given as a sub-title at the head of this report were, by certain of the butchers, asserted not to have been *dismissed.* And *Messrs. M. H. Carpenter, J. S. Black, and T. J. Durant, in behalf of the new corporation*, having moved to dismiss them also as embraced in the agreement, affidavits were filed on the one side and on the other; the affidavits of the butchers opposed to the "monopoly" affirming that they were plaintiffs in error in these three cases, and that they never consented to what had been done, and that no proper authority had been given to do it. This matter was directed to be heard with the merits. The case being advanced was first heard on these, January 11th, 1872; Mr. Justice Nelson being indisposed and not in his seat. Being ordered for reargument, it was heard again, February 3d, 4th, and 5th, 1873.

*Mr. John A. Campbell, and also Mr. J. Q. A. Fellows, argued the case at much length and on the authorities, in behalf of*

*the plaintiffs in error.* The reporter cannot pretend to give more than such an abstract of the argument as may show to what the opinion of the court was meant to be responsive.

I. The learned counsel quoting Thiers,* contended that "the right to one's self, to one's own faculties, physical and intellectual, one's own brain, eyes, hands, feet, in a word to his soul and body, was an incontestable right; one of whose enjoyment and exercise by its owner no one could complain, and one which no one could take away. More than this, the obligation to labor was a duty, a thing ordained of God, and which if submitted to faithfully, secured a blessing to the human family." Quoting further from Turgot, De Tocqueville, Buckle, Dalloz, Leiber, Sir G. C. Lewis, and others, the counsel gave a vivid and very interesting account of the condition and grievances of the lower orders in various countries of Europe, especially in France, with its *banalités* and "*seigneurs justiciers*," during those days when "the prying eye of the government followed the butcher to the shambles and the baker to the oven;" when "the peasant could not cross a river without paying to some nobleman a toll, nor take the produce which he raised to market until he had bought leave to do so; nor consume what remained of his grain till he had sent it to the lord's mill to be ground, nor full his cloths on his own works, nor sharpen his tools at his own grindstone, nor make wine, oil, or cider at his own press;" the days of monopolies; monopolies which followed men in their daily avocations, troubled them with its meddling spirit, and worst of all diminished their responsibility to themselves. Passing from Scotland, in which the cultivators of each barony or regality were obliged to pay a "multure" on each stack of hay or straw reaped by the farmer—"thirlage" or "thraldom," as it was called—and when lands were subject to an "astriction" astricting them and their inhabitants to particular mills for the grinding of grain that was raised on them, and coming to Great Britain, the counsel adverted to the reigns of Edward III, and Rich-

---

* De la Propriété, 36, 47.

ard II, and their successors, when the price of labor was fixed by law, and when every able-bodied man and woman, not being a merchant or craftsman, was "bounden" to serve at the wages fixed, and when to prevent the rural laborer from seeking the towns he was forbidden to leave his own village. It was in England that the earliest battle for civil liberty had been made. Macaulay thus described it:*

"It was in the Parliament of 1601, that the opposition which had, during forty years, been silently gathering and husbanding strength, fought its first great battle and won its first victory. The ground was well chosen. The English sovereigns had always been intrusted with the supreme direction of commercial police. It was their undoubted prerogative to regulate coins, weights, measures, and to appoint fairs, markets, and ports. The line which bounded their authority over trade, had, as usual, been but loosely drawn. They therefore, as usual, encroached on the province which rightfully belonged to the legislature. The encroachment was, as usual, patiently borne, till it became serious. But at length the Queen took upon herself to grant patents of monopoly by scores. There was scarcely a family in the realm that did not feel itself aggrieved by the oppression and extortion which the abuse naturally caused. Iron, oil, vinegar, coal, lead, starch, yarn, leather, glass, could be bought only at exorbitant prices. The House of Commons met in an angry and determined mood. It was in vain that a courtly minority blamed the speaker for suffering the acts of the Queen's highness to be called in question. The language of the discontented party was high and menacing, and was echoed by the voice of the whole nation. The coach of the chief minister of the crown was surrounded by an indignant populace, who cursed *monopolies,* and exclaimed that the prerogative should not be allowed to touch the old liberties of England."

Macaulay proceeded to say that the Queen's reign was in danger of a shameful and disgraceful end, but that she, with admirable judgment, declined the contest and redressed the grievance, and in touching language thanked the Commons for their tender care of the common weal.

---

* History of England, vol. 1, p. 58.

The great grievance of our ancestors about the time that. they largely left England, was this very subject. Sir John Culpeper, in a speech in the Long Parliament, thus spoke of these monopolies and pollers of the people:

"They are a nest of wasps—a swarm of vermin which have overcrept the land. Like the frogs of Egypt they have gotten possession of our dwellings, and we have scarce a room free from them. They sup in our cup; they dip in our dish; they sit by our fire. We find them in the dye-fat, wash-bowl, and powdering-tub. They share with the butler in his box. They will not bait us a pin. We may not buy our clothes without their brokage. These are the leeches that have sucked the commonwealth so hard that it is almost hectical. Mr. Speaker! I have echoed to you the cries of the Kingdom. I will tell you their hopes. They look to Heaven for a blessing on this Parliament":

Monopolies concerning wine, coal, salt, starch, the dressing of meat in taverns, beavers, belts, bone-lace, leather, pins, and other things, to the gathering of rags, are referred to in this speech.

But more important than these discussions in Parliament were the solemn judgments of the courts of Great Britain. The great and leading case was that reported by Lord Coke, *The Case of Monopolies.** The patent was granted to Darcy to buy beyond the sea all such playing-cards as he thought good, and to utter and sell them within the kingdom, and that he and his agents and deputies should have the whole trade, traffic, and merchandise of playing-cards, and that another person and none other should have the making of playing-cards within the realm. A suit was brought against a citizen of London for selling playing-cards, and he pleaded that being a citizen free of the city he had a right to do so. And—

"Resolved (Popham, C. J.) *per totam Curiam,* that the said grant of the plaintiff of the sole making of cards within the realm, was utterly void, and for two reasons:

* 11 Reports, 85.

"1. That it is a monopoly and against the common law.

"2. That it is against divers acts of Parliament."

[The learned counsel read Sir Edward Coke's report of the judgment in this case, which was given fully in the brief at length, seeking to apply it to the cases before the court.]

It was from a country which had been thus oppressed by monopolies that our ancestors came. And a profound conviction of the truth of the sentiment already quoted from M. Thiers—that every man has a right to his own faculties, physical and intellectual, and that this is a right, one of which no one can complain, and no one deprive him—was at the bottom of the settlement of the country by them. Accordingly, free competition in business, free enterprise, the absence of all exactions by petty tyranny, of all spoliation of private right by public authority—the suppression of sinecures, monopolies, titles of nobility, and exemption from legal duties—were exactly what the colonists sought for and obtained by their settlement here, their long contest with physical evils that attended the colonial condition, their struggle for independence, and their efforts, exertions, and sacrifices since.

Now, the act of the Louisiana legislature was in the face of all these principles; it made it unlawful for men to use their own land for their own purposes; made it unlawful to any except the seventeen of this company to exercise a lawful and necessary business for which others were as competent as they, for which at least one thousand persons in the three parishes named had qualified themselves, had framed their arrangements in life, had invested their property, and had founded all their hopes of success on earth. The act was a pure MONOPOLY; as such against common right, and void at the common law of England. And it was equally void by our own law. The case of *The Norwich Gaslight Company* v. *The Norwich City Gaslight Company*,[*] a case in Connecticut, and more pointedly still, *The City of Chicago* v. *Rumpff*,[†] a case in Illinois, and *The Mayor of the City of Hudson* v. *Thorne*,[‡]

---

[*] 25 Connecticut, 19.     [†] 45 Illinois, 90.     [‡] 7 Paige, 261.

a case in New York, were in entire harmony with Coke's great case, and declared that monopolies are against common right.*

How, indeed, do authors and inventors maintain a monopoly in even the works of their own brain? in that which in a large sense, may be called their own. Only through a provision of the Constitution preserving such works to them. Many State constitutions have denounced monopolies by name, and it is certain that every species of exclusive privilege is an offence to the people, and that popular aversion to them does but increase the more largely that they are granted.

II. *But if this monopoly were not thus void at common law, it would be so under both the thirteenth and the fourteenth amendments.*

The thirteenth amendment prohibits " slavery and involuntary *servitude*." The expressions are ancient ones, and were familiar even before the time when they appeared in the great Ordinance of 1787, for the government of our vast Northwestern Territory; a territory from which great States were to arise. In that ordinance they are associated with enactments affording comprehensive protection for life, liberty, and property; for the spread of religion, morality, and knowledge; for maintaining the inviolability of contracts, the freedom of navigation upon the public rivers, and the unrestrained conveyance of property by contract and devise, and for equality of children in the inheritance of patrimonial estates. The ordinance became a law after Great Britain, in form the most popular government in Europe, had been expelled from that territory because of " injuries and usurpations having in direct object the establishment of an absolute tyranny over the States." Feudalism at that time prevailed in nearly all the kingdoms of Europe, and serfdom and servitude and feudal service depressed their people to the level of slaves. The prohibition of " slavery and involuntary servitude " in every form and degree, except as a

---

* The statement of these cases being made, *infra*, pp. 106-109, in the dissenting opinion of Mr. Justice Field, is not here given.

sentence úpon a conviction for crime, comprises much more than the abolition or prohibition of African slavery. Slavery in the annals of the world had been the ultimate solution of controversies between the creditor and debtor; the conqueror and his captive; the father and his child; the state and an offender against its laws. The laws might enslave a man to the soil. The whole of Europe in 1787 was crowded with persons who were held as vassals to their landlord, and serfs on his dominions. The American constitution for that great territory was framed to abolish slavery and involuntary servitude in all forms, and in all degrees in which they have existed· among men, except as a punishment for crime duly proved and adjudged.

Now, the act of which we complain has made of three parishes of Louisiana " enthralled ground." " The seventeen " have *astricted* not only the inhabitants of those parishes, but of all other portions of the earth who may have cattle or animals for sale or for food, to land them at the wharves of that company (if brought to that territory), to keep them in their pens, yards, or stables, and to prepare them for market·in their abattoir or slaughter-house. Lest some competitor may present more tempting or convenient arrangements, the act directs that all of these shall be closed on a particular day, and prohibits any one from having, keeping, or establishing any other; and a peremptory·command is given that all animals shall be sheltered, preserved, and protected by this corporation, and by none other, under heavy penalties.

Is not this " a servitude?" Might it not be so considered in a strict sense ? It is like the " thirlage" of the old Scotch law and the *banalités* of seignioral France; which were servitudes undoubtedly. But, if not strictly a servitude, it is certainly a servitude in a more popular sense, and, being an enforced one, it is an involuntary servitude. Men are surely subjected to a servitude when, throughout three parishes, embracing 1200 square miles, every man and every woman in them is compelled to refrain from the use of their own land and exercise of their own industry and the improve-

ment of their own property, in a way confessedly lawful and necessary in itself, and made unlawful and unnecessary only because, at their cost, an exclusive privilege is granted to seventeen other persons to improve and exercise it for them. We have here the "servients" and the "dominants" and the "thraldom" of the old seignioral system. The servients in this case are all the inhabitants in any manner using animals brought to the markets for sale or for slaughter. The dominants are "the seventeen" made into a corporation, with these seignioral rights and privileges. The masters are these seventeen, who alone can admit or refuse other members to their corporation. The abused persons are the community, who are deprived of what was a common right and bound under a thraldom.

III. *The act is even more plainly in the face of the fourteenth amendment.* That amendment was a development of the thirteenth, and is a more comprehensive exposition of the principles which lie at the foundation of the thirteenth.

Slavery had been abolished as the issue of the civil war. More than three millions of a population lately servile, were liberated without preparation for any political or civil duty. Besides this population of emancipated slaves, there was a large and growing population who came to this country without education in the laws and constitution of the country, and who had begun to exert a perceptible influence over our government. There were also a large number of unsettled and difficult questions of State and National right that had no other settlement or solution but what the war had afforded. It had been maintained from the origin of the Constitution, by one political party—men of a high order of ability, and who exerted a great influence—that the *State* was the highest political organization in the United States; that through the consent of the separate States the Union had been formed for limited purposes; that there was no social union except by and through the States, and that in extreme cases the several States might cancel the obligations to the Federal government and reclaim the allegiance and fidelity of its members. Such were the doctrines of Mr.

Calhoun, and of others; both those who preceded and those who have followed him. It is nowhere declared in the Constitution what "a citizen" is, or what constitutes citizenship; and what ideas were entertained of citizenship by one class in our country may be seen in the South Carolina case of *Hunt* v. *The State*, where Harper, J., referring to the arguments of Messrs. Petigru, Blanding, McWillie, and Williams—men eminent in the South as jurists—who were opposing nullification, says:

> "It has been *admitted* in argument by all the counsel except one, that in case of a secession by the State from the Union, the citizens and constituted authorities would be bound to obey and give effect to the act."

But the fourteenth amendment does define citizenship and the relations of citizens to the State and Federal government. It ordains that "all persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the State where they reside." Citizenship in a State is made by residence and without reference to the consent of the State. Yet, by the same amendment, when it exists, no State can abridge its privileges or immunities. The doctrine of the "States-Rights party," led in modern times by Mr. Calhoun, was, that there was no citizenship in the whole United States, except *sub modo* and by the permission of the States. According to their theory the United States had no integral existence except as an incomplete combination among several integers. The fourteenth amendment struck at, and forever destroyed, all such doctrines. It seems to have been made under an apprehension of a destructive faculty in the State governments. It consolidated the several "integers" into a consistent whole. Were there Brahmans in Massachusetts, "the chief of all creatures, and with the universe held in charge for them," and Soudras in Pennsylvania, "who simply had life through the benevolence of the other," this amendment places them on the same footing. By it the national principle has received an indefinite enlarge-

ment. The tie between the United States and every citizen in every part of its own jurisdiction has been made intimate and familiar. To the same extent the confederate features of the government have been obliterated. The States in their closest connection with the members of the State, have been placed under the oversight and restraining and enforcing hand of Congress. The purpose is manifest, to establish through the whole jurisdiction of the United States ONE PEOPLE, and that every member of the empire shall understand and appreciate the fact that his privileges and immunities cannot be abridged by State authority; that State laws must be so framed as to secure life, liberty, property from arbitrary violation and secure protection of law to all. Thus, as the great personal rights of each and every person were established and guarded, a reasonable confidence that there would be good government might seem to be justified. The amendment embodies all that the statesmanship of the country has conceived for accommodating the Constitution and the institutions of the country to the vast additions of territory, increase of the population, multiplication of States and Territorial governments, the annual influx of aliens, and the mighty changes produced by revolutionary events, and by social, industrial, commercial development. It is an act of Union, an act to determine the reciprocal relations of the millions of population within the bounds of the United States—the numerous State governments and the entire United States administered by a common government—that they might mutually sustain, support, and co-operate for the promotion of peace, security, and the assurance of property and liberty.

Under it the fact of citizenship does not depend upon parentage, family, nor upon the historical division of the land into separate States, some of whom had a glorious history, of which its members were justly proud. Citizenship is assigned to nativity in any portion of the United States, and every person so born is a citizen. The naturalized person acquires citizenship of the same kind without any action of the State at all. So either may by this title of citizenship

make his residence at any place in the United States, and under whatever form of State administration, he must be treated as a citizen of that State. His "privileges and immunities" must not be impaired, and all the privileges of the English Magna Charta in favor of freemen are collected upon him and overshadow him as derived from this amendment. The States must not weaken nor destroy them. The comprehensiveness of this amendment, the natural and necessary breadth of the language; the history of some of the clauses; their connection with discussions, contests, and domestic commotions that form landmarks in the annals of constitutional government; the circumstances under which it became part of the Constitution, demonstrate that the weighty import of what it ordains is not to be misunderstood.

From whatever cause originating, or with whatever special and present or pressing purpose passed, the fourteenth amendment is not confined to the population that had been servile, or to that which had any of the disabilities or disqualifications arising from race or from contract. The vast number of laborers in mines, manufactories, commerce, as well as the laborers on the plantations, are defended against the unequal legislation of the States. Nor is the amendment confined in its application to laboring men. The mandate is universal in its application to persons of every class and every condition. There are forty millions of population who may refer to it to determine their rank in the United States, and in any particular State. There are thirty-seven governments among the States to which it directs command, and the States that may be hereafter admitted, and the persons hereafter to be born or naturalized will find here declarations of the same weighty import to them all. To the State governments it says: "Let there be no law made or enforced to diminish one of the privileges and immunities of the people of the United States;" nor law to deprive them of their life, liberty, property, or protection without trial. To the people the declaration is: "Take and hold this your certificate of status and of

capacity, the Magna Charta of your rights and liberties."
To the Congress it says: "Take care to enforce this article
by suitable laws."

The only question then is this: "When a State passes a
law depriving a thousand people, who have acquired valu-
able property, and who, through its instrumentality, are en-
gaged in an honest and necessary business, which they under-
stand, of their right to use such their own property, and to
labor in such their honest and necessary business, and gives
a monopoly, embracing the whole subject, including the
right to labor in such business, to seventeen other persons—
whether the State has abridged any of the privileges or im-
munities of these thousand persons?"

Now, what are "privileges and immunities" in the sense
of the Constitution? They are undoubtedly the personal
and civil rights which usage, tradition, the habits of society,
written law, and the common sentiments of people have
recognized as forming the basis of the institutions of the
country. The first clause in the fourteenth amendment
does not deal with any interstate relations, nor relations
that depend in any manner upon State laws, nor is any
standard among the States referred to for the ascertainment
of these privileges and immunities. It assumes that there
were privileges and immunities that belong to an American
citizen, and the State is commanded neither to make nor to
enforce any law that will abridge them.

The case of *Ward* v. *Maryland*\* bears upon the matter.
That case involved the validity of a statute of Maryland
which imposed a tax in the form of a license to sell the agri-
cultural and manufactured articles of other States than Ma-
ryland by card, sample, or printed lists, or catalogue. The
purpose of the tax was to prohibit sales in that mode, and
to relieve the resident merchant from the competition of
these itinerant or transient dealers. This court decided
that the power to carry on commerce in this form was "a
privilege or immunity" of the sojourner.

---

\* 12 Wallace, 419.

2. *The act in question is equally in the face of the fourteenth amendment in that it denies to the plaintiffs the equal protection of the laws.* By an act of legislative partiality it enriches seventeen persons and deprives nearly a thousand others of the same class, and as upright and competent as the seventeen, of the means by which they earn their daily bread.

3. *It is equally in violation of it, since it deprives them of their property without due process of law.* The right to labor, the right to one's self physically and intellectually, and to the product of one's own faculties, is past doubt property, and property of a sacred kind. Yet *this* property is destroyed by the act; destroyed not by due process of law, but by charter; a grant of privilege, of monopoly; which allows such rights in this matter to no one but to a favored "seventeen."

It will of course be sought to justify the act as an exercise of the police power; a matter confessedly, in its general scope, within the jurisdiction of the States. Without doubt, in that general scope, the subject of sanitary laws belong to the exercise of the power set up; but it does not follow there is no restraint on State power of legislation in police matters. The police power was invoked in the case of *Gibbons* v. *Ogden.*\* New York had granted to eminent citizens a monopoly of steamboat navigation in her waters as compensation for their enterprise and invention. They set up that Gibbons should not have, keep, establish, or land with a steamboat to carry passengers and freight on the navigable waters of New York. Of course the State had a great jurisdiction over its waters for all purposes of police, but none to control navigation and intercourse between the United States and foreign nations, or among the States. Suppose the grant to Fulton and Livingston had been that all persons coming to the United States, or from the States around, should, because of their services to the State, land on one of their lots and pass through their gates. This would abridge the rights secured in the fourteenth amendment.

---

\* 9 Wheaton, 203.

The right to move with freedom, to choose his highway, and to be exempt from impositions, belongs to the citizen. He must have this power to move freely to perform his duties as a citizen.

The *Passenger Cases*, in 7 Howard, are replete with discussions on the police powers of the States. The arguments in that case appeal to the various titles in which the freedom of State action has been supposed to be unlimited. Immigrants, it was said, would bring pauperism, crime, idleness, increased expenditures, disorderly conduct. The acts, it was said, were in the nature of health acts. But the court said that the police power could not be invoked to justify even the small tax there disputed.

*Messrs. M. H. Carpenter and J. S. Black (a brief of Mr. Charles Allen being filed on the same side), and Mr. T. J. Durant, representing in addition the State of Louisiana, contra.*

Mr. Justice MILLER, now, April 14th, 1873, delivered the opinion of the court.

These cases are brought here by writs of error to the Supreme Court of the State of Louisiana. They arise out of the efforts of the butchers of New Orleans to resist the Crescent City Live-Stock Landing and Slaughter-House Company in the exercise of certain powers conferred by the charter which created it, and which was granted by the legislature of that State.

The cases named on a preceding page,* with others which have been brought here and dismissed by agreement, were all decided by the Supreme Court of Louisiana in favor of the Slaughter-House Company, as we shall hereafter call it for the sake of brevity, and these writs are brought to reverse those decisions.

The records were filed in this court in 1870, and were argued before it at length on a motion made by plaintiffs in error for an order in the nature of an injunction or super-

---

* See *supra*, p. 36, sub-title.

sedeas, pending the action of the court on the merits. The opinion on that motion is reported in 10 Wallace, 273.

On account of the importance of the questions involved in these cases they were, by permission of the court, taken up out of their order on the docket and argued in January, 1872. At that hearing one of the justices was absent, and it was found, on consultation, that there was a diversity of views among those who were present. Impressed with the gravity of the questions raised in the argument, the court under these circumstances ordered that the cases be placed on the calendar and reargued before a full bench. This argument was had early in February last.

Preliminary to the consideration of those questions is a motion by the defendant to dismiss the cases, on the ground that the contest between the parties has been adjusted by an agreement made since the records came into this court, and that part of that agreement is that these writs should be dismissed. This motion was heard with the argument on the merits, and was much pressed by counsel. It is supported by affidavits and by copies of the written agreement relied on. It is sufficient to say of these that we do not find in them satisfactory evidence that the agreement is binding upon all the parties to the record who are named as plaintiffs in the several writs of error, and that there are parties now before the court, in each of the three cases, the names of which appear on a preceding page,* who have not consented to their dismissal, and who are not bound by the action of those who have so consented. They have a right to be heard, and the motion to dismiss cannot prevail.

The records show that the plaintiffs in error relied upon, and asserted throughout the entire course of the litigation in the State courts, that the grant of privileges in the charter of defendant, which they were contesting, was a violation of the most important provisions of the thirteenth and fourteenth articles of amendment of the Constitution of the United States. The jurisdiction and the duty of this court

---

:          * See subtitle, *supra*, p. 36.—REP.

to review the judgment of the State court on those questions is clear and is imperative.

The statute thus assailed as unconstitutional was passed March 8th, 1869, and is entitled "An act to protect the health of the city of New Orleans, to locate the stock-landings and slaughter-houses, and to incorporate the Crescent City Live-Stock Landing and Slaughter-House Company."

The first section forbids the landing or slaughtering of animals whose flesh is intended for food, within the city of New Orleans and other parishes and boundaries named and defined, or the keeping or establishing any slaughter-houses or *abattoirs* within those limits except by the corporation thereby created, which is also limited to certain places afterwards mentioned. Suitable penalties are enacted for violations of this prohibition.

The second section designates the corporators, gives the name to the corporation, and confers on it the usual corporate powers.

The third and fourth sections authorize the company to establish and erect within certain territorial limits, therein defined, one or more stock-yards, stock-landings, and slaughter-houses, and imposes upon it the duty of erecting, on or before the first day of June, 1869, one grand slaughter-house of sufficient capacity for slaughtering five hundred animals per day.

It declares that the company, after it shall have prepared all the necessary buildings, yards, and other conveniences for that purpose, shall have the sole and exclusive privilege of conducting and carrying on the live-stock landing and slaughter-house business within the limits and privilege granted by the act, and that all such animals shall be landed at the stock-landings and slaughtered at the slaughter-houses of the company, and nowhere else. Penalties are enacted for infractions of this provision, and prices fixed for the maximum charges of the company for each steamboat and for each animal landed.

Section five orders the closing up of all other stock-land-

ings and slaughter-houses after the first day of June, in the parishes of Orleans, Jefferson, and St. Bernard, and makes it the duty of the company to permit any person to slaughter animals in their slaughter-houses under a heavy penalty for each refusal. Another section fixes a limit to the charges to be made by the company for each animal so slaughtered in their building, and another provides for an inspection of all animals intended to be so slaughtered, by an officer appointed by the governor of the State for that purpose.

These are the principal features of the statute, and are all that have any bearing upon the questions to be decided by us.

This statute is denounced not only as creating a monopoly and conferring odious and exclusive privileges upon a small number of persons at the expense of the great body of the community of New Orleans, but it is asserted that it deprives a large and meritorious class of citizens—the whole of the butchers of the city—of the right to exercise their trade, the business to which they have been trained and on which they depend for the support of themselves and their families; and that the unrestricted exercise of the business of butchering is necessary to the daily subsistence of the population of the city.

But a critical examination of the act hardly justifies these assertions.

It is true that it grants, for a period of twenty-five years, exclusive privileges. And whether those privileges are at the expense of the community in the sense of a curtailment of any of their fundamental rights, or even in the sense of doing them an injury, is a question open to considerations to be hereafter stated. But it is not true that it deprives the butchers of the right to exercise their trade, or imposes upon them any restriction incompatible with its successful pursuit, or furnishing the people of the city with the necessary daily supply of animal food.

The act divides itself into two main grants of privilege,— the one in reference to stock-landings and stock-yards, and

the other to slaughter-houses. That the landing of live-stock in large droves, from steamboats on the bank of the river, and from railroad trains, should, for the safety and comfort of the people and the care of the animals, be limited to proper places, and those not numerous, it needs no argument to prove. Nor can it be injurious to the general community that while the duty of making ample preparation for this is imposed upon a few men, or a corporation, they should, to enable them to do it successfully, have the exclusive right of providing such landing-places, and receiving a fair compensation for the service.

It is, however, the slaughter-house privilege, which is mainly relied on to justify the charges of gross injustice to the public, and invasion of private right.

It is not, and cannot be successfully controverted, that it is both the right and the duty of the legislative body—the supreme power of the State or municipality—to prescribe and determine the localities where the business of slaughtering for a great city may be conducted. To do this effectively it is indispensable that all persons who slaughter animals for food shall do it in those places *and nowhere else*.

The statute under consideration defines these localities and forbids slaughtering in any other. It does not, as has been asserted, prevent the butcher from doing his own slaughtering. On the contrary, the Slaughter-House Company is required, under a heavy penalty, to permit any person who wishes to do so, to slaughter in their houses; and they are bound to make ample provision for the convenience of all the slaughtering for the entire city. The butcher then is still permitted to slaughter, to prepare, and to sell his own meats; but he is required to slaughter at a specified place and to pay a reasonable compensation for the use of the accommodations furnished him at that place.

The wisdom of the monopoly granted by the legislature may be open to question, but it is difficult to see a justification for the assertion that the butchers are deprived of the right to labor in their occupation, or the people of their daily service in preparing food, or how this statute, with the

duties and guards imposed upon the company, can be said to destroy the business of the butcher, or seriously interfere with its pursuit.

The power here exercised by the legislature of Louisiana is, in its essential nature, one which has been, up to the present period in the constitutional history of this country, always conceded to belong to the States, however it may *now* be questioned in some of its details.

" Unwholesome trades, slaughter-houses, operations offensive to the senses, the deposit of powder, the application of steam power to propel cars, the building with combustible materials, and the burial of the dead, may all," says Chancellor Kent,* " be interdicted by law, in the midst of dense masses of population, on the general and rational principle, that every person ought so to use his property as not to injure his neighbors; and that private interests must be made subservient to the general interests of the community." This is called the police power; and it is declared by Chief Justice Shaw† that it is much easier to perceive and realize the existence and sources of it than to mark its boundaries, or prescribe limits to its exercise.

This power is, and must be from its very nature, incapable of any very exact definition or limitation. Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property. " It extends," says another eminent judge,‡ " to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State; . . . and persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the State. Of the perfect right of the legislature to do this no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned."

* 2 Commentaries, 340. † Commonwealth *v.* Alger, 7 Cushing, 84.
‡ Thorpe *v.* Rutland and Burlington Railroad Co., 27 Vermont, 149.

The regulation of the place and manner of conducting the slaughtering of animals, and the business of butchering within a city, and the inspecti·n of the animals to be killed for meat, and of the meat afterwards, are among the most necessary and frequent exercises of this power. It is not, therefore, needed that we should seek for a comprehensive definition, but rather look for the proper source of its exercise.

In *Gibbons* v. *Ogden*,\* Chief Justice Marshall, speaking of inspection laws passed by the States, says: " They form a portion of that immense mass of legislation which controls everything within the territory of a State not surrendered to the General Government—all which can be most advantageously administered by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, &c., are component parts. No direct general power over these objects is granted to Congress; and consequently they remain subject to State legislation."

The exclusive authority of State legislation over this subject is strikingly illustrated in the case of the *City of New York* v. *Miln*.† In that case the defendant was prosecuted for failing to comply with a statute of New York which required of every master of a vessel arriving from a foreign port, in that of New York City, to report the names of all his passengers, with certain particulars of their age, occupation, last place of settlement, and place of their birth. It was argued that this act was an invasion of the exclusive right of Congress to regulate commerce. And it cannot be denied that such a statute operated at least indirectly upon the commercial intercourse between the citizens of the United States and of foreign countries. But notwithstanding this it was held to be an exercise of the police power properly within the control of the State, and unaffected by the clause of the Constitution which conferred on Congress the right to regulate commerce.

---

\* 9 Wheaton, 203.     † 11 Peters, 102.

To the same purpose are the recent cases of the *The License Tax*,\* and *United States* v. *De Witt*.† In the latter case an act of Congress which undertook as a part of the internal revenue laws to make it a misdemeanor to mix for sale naphtha and illuminating oils, or to sell oil of petroleum inflammable at less than a prescribed temperature, was held to be void, because as a police regulation the power to make such a law belonged to the States, and did not belong to Congress.

It cannot be denied that the statute under consideration is aptly framed to remove from the more densely populated part of the city, the noxious slaughter-houses, and large and offensive collections of animals necessarily incident to the slaughtering business of a large city, and to locate them where the convenience, health, and comfort of the people require they shall be located. And it must be conceded that the means adopted by the act for this purpose are appropriate, are stringent, and effectual. But it is said that in creating a corporation for this purpose, and conferring upon it exclusive privileges—privileges which it is said constitute a monopoly—the legislature has exceeded its power. If this statute had imposed on the city of New Orleans precisely the same duties, accompanied by the same privileges, which it has on the corporation which it created, it is believed that no question would have been raised as to its constitutionality. In that case the effect on the butchers in pursuit of their occupation and on the public would have been the same as it is now. Why cannot the legislature confer the same powers on another corporation, created for a lawful and useful public object, that it can on the municipal corporation already existing? That wherever a legislature has the right to accomplish a certain result, and that result is best attained by means of a corporation, it has the right to create such a corporation, and to endow it with the powers necessary to effect the desired and lawful purpose, seems hardly to admit of debate. The proposition is ably discussed and affirmed in the case of *McCulloch* v. *The State of Maryland*,‡ in relation to the power of Congress to organize

---

\* 5 Wallace, 471.          † 9 Id. 41.          ‡ 4 Wheaton, 316.

the Bank of the United States to aid in the fiscal operations of the government.

It can readily be seen that the interested vigilance of the corporation created by the Louisiana legislature will be more efficient in enforcing the limitation prescribed for the stock-landing and slaughtering business for the good of the city than the ordinary efforts of the officers of the law.

Unless, therefore, it can be maintained that the exclusive privilege granted by this charter to the corporation, is beyond the power of the legislature of Louisiana, there can be no just exception to the validity of the statute. And in this respect we are not able to see that these privileges are especially odious or objectionable. The duty imposed as a consideration for the privilege is well defined, and its enforcement well guarded. The prices or charges to be made by the company are limited by the statute, and we are not advised that they are on the whole exorbitant or unjust.

The proposition is, therefore, reduced to these terms: Can any exclusive privileges be granted to any of its citizens, or to a corporation, by the legislature of a State?

The eminent and learned counsel who has twice argued the negative of this question, has displayed a research into the history of monopolies in England, and the European continent, only equalled by the eloquence with which they are denounced.

But it is to be observed, that all such references are to monopolies established by the monarch in derogation of the rights of his subjects, or arise out of transactions in which the people were unrepresented, and their interests uncared for. The great *Case of Monopolies*, reported by Coke, and so fully stated in the brief, was undoubtedly a contest of the commons against the monarch. The decision is based upon the ground that it was against common law, and the argument was aimed at the unlawful assumption of power by the crown; for whoever doubted the authority of Parliament to change or modify the common law?. The discussion in the House of Commons cited from Macaulay clearly

establishes that the contest was between the crown, and the people represented in Parliament.

But we think it may be safely affirmed, that the Parliament of Great Britain, representing the people in their legislative functions, and the legislative bodies of this country, have from time immemorial to the present day, continued to grant to persons and corporations exclusive privileges—privileges denied to other citizens—privileges which come within any just definition of the word monopoly, as much as those now under consideration; and that the power to do this has never been questioned or denied. Nor can it be truthfully denied, that some of the most useful and beneficial enterprises set on foot for the general good, have been made successful by means of these exclusive rights, and could only have been conducted to success in that way.

It may, therefore, be considered as established, that the authority of the legislature of Louisiana to pass the present statute is ample, unless some restraint in the exercise of that power be found in the constitution of that State or in the amendments to the Constitution of the United States, adopted since the date of the decisions we have already cited.

If any such restraint is supposed to exist in the constitution of the State, the Supreme Court of Louisiana having necessarily passed on that question, it would not be open to review in this court.

The plaintiffs in error accepting this issue, allege that the statute is a violation of the Constitution of the United States in these several particulars:

That it creates an involuntary servitude forbidden by the thirteenth article of amendment;

That it abridges the privileges and immunities of citizens of the United States;

That it denies to the plaintiffs the equal protection of the laws; and,

That it deprives them of their property without due process of law; contrary to the provisions of the first section of the fourteenth article of amendment.

This court is thus called upon for the first time to give construction to these articles.

We do not conceal from ourselves the great responsibility which this duty devolves upon us. No questions so far-reaching and pervading in their consequences, so profoundly interesting to the people of this country, and so important in their bearing upon the relations of the United States, and of the several States to each other and to the citizens of the States and of the United States, have been before this court during the official life of any of its present members. We have given every opportunity for a full hearing at the bar; we have discussed it freely and compared views among ourselves; we have taken ample time for careful deliberation, and we now propose to announce the judgments which we have formed in the construction of those articles, so far as we have found them necessary to the decision of the cases before us, and beyond that we have neither the inclination nor the right to go.

Twelve articles of amendment were added to the Federal Constitution soon after the original organization of the government under it in 1789. Of these all but the last were adopted so soon afterwards as to justify the statement that they were practically contemporaneous with the adoption of the original; and the twelfth, adopted in eighteen hundred and three, was so nearly so as to have become, like all the others, historical and of another age. But within the last eight years three other articles of amendment of vast importance have been added by the voice of the people to that now venerable instrument.

The most cursory glance at these articles discloses a unity of purpose, when taken in connection with the history of the times, which cannot fail to have an important bearing on any question of doubt concerning their true meaning. Nor can such doubts, when any reasonably exist, be safely and rationally solved without a reference to that history; for in it is found the occasion and the necessity for recurring again to the great source of power in this country, the people of the States, for additional guarantees of human rights;

additional powers to the Federal government; additional restraints upon those of the States. Fortunately that his-tory is fresh within the memory of us all, and its leading features, as they bear upon the matter before us, free from doubt.

The institution of African slavery, as it existed in about half the States of the Union, and the contests pervading the public mind for many years, between those who desired its curtailment and ultimate extinction and those who desired additional safeguards for its security and perpetuation, cul-minated in the effort, on the part of most of the States in which slavery existed, to separate from the Federal govern-ment, and to resist its authority. This constituted the war of the rebellion, and whatever auxiliary causes may have contributed to bring about this war, undoubtedly the over-shadowing and efficient cause was African slavery.

In that struggle slavery, as a legalized social relation, per-ished. It perished as a necessity of the bitterness and force of the conflict. When the armies of freedom found them-selves upon the soil of slavery they could do nothing less than free the poor victims whose enforced servitude was the foundation of the quarrel. And when hard pressed in the contest these men (for they proved themselves men in that terrible crisis) offered their services and were accepted by thousands to aid in suppressing the unlawful rebellion, slavery was at an end wherever the Federal government succeeded in that purpose. The proclamation of President Lincoln expressed an accomplished fact as to a large portion of the insurrectionary districts, when he declared slavery abolished in them all. But the war being over, those who had succeeded in re-establishing the authority of the Federal government were not content to permit this great act of emancipation to rest on the actual results of the contest or the proclamation of the Executive, both of which might have been questioned in after times, and they determined to place this main and most valuable result in the Constitution of the restored Union as one of its fundamental articles. Hence the thirteenth article of amendment of that instru-

ment. Its two short sections seem hardly to admit of construction, so vigorous is their expression and so appropriate to the purpose we have indicated.

"1. Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction.

"2. Congress shall have power to enforce this article by appropriate legislation."

To withdraw the mind from the contemplation of this grand yet simple declaration of the personal freedom of all the human race within the jurisdiction of this government—a declaration designed to establish the freedom of four millions of slaves—and with a microscopic search endeavor to find in it a reference to servitudes, which may have been attached to property in certain localities, requires an effort, to say the least of it.

That a personal servitude was meant is proved by the use of the word "involuntary," which can only apply to human beings. The exception of servitude as a punishment for crime gives an idea of the class of servitude that is meant. The word servitude is of larger meaning than slavery, as the latter is popularly understood in this country, and the obvious purpose was to forbid all shades and conditions of African slavery. It was very well understood that in the form of apprenticeship for long terms, as it had been practiced in the West India Islands, on the abolition of slavery by the English government, or by reducing the slaves to the condition of serfs attached to the plantation, the purpose of the article might have been evaded, if only the word slavery had been used. The case of the apprentice slave, held under a law of Maryland, liberated by Chief Justice Chase, on a writ of habeas corpus under this article, illustrates this course of observation.* And it is all that we deem necessary to say on the application of that article to the statute of Louisiana, now under consideration.

---

* Matter of Turner, 1 Abbott United States Reports, 84.

The process of restoring to their proper relations with the Federal government and with the other States those which had sided with the rebellion, undertaken under the proclamation of President Johnson in 1865, and before the assembling of Congress, developed the fact that, notwithstanding the formal recognition by those States of the abolition of slavery, the condition of the slave race would, without further protection of the Federal government, be almost as bad as it was before. Among the first acts of legislation adopted by several of the States in the legislative bodies which claimed to be in their normal relations with the Federal government, were laws which imposed upon the colored race onerous disabilities and burdens, and curtailed their rights in the pursuit of life, liberty, and property to such an extent that their freedom was of little value, while they had lost the protection which they had received from their former owners from motives both of interest and humanity.

They were in some States forbidden to appear in the towns in any other character than menial servants. They were required to reside on and cultivate the soil without the right to purchase or own it. They were excluded from many occupations of gain, and were not permitted to give testimony in the courts in any case where a white man was a party. It was said that their lives were at the mercy of bad men, either because the laws for their protection were insufficient or were not enforced.

These circumstances, whatever of falsehood or misconception may have been mingled with their presentation, forced upon the statesmen who had conducted the Federal government in safety through the crisis of the rebellion, and who supposed that by the thirteenth article of amendment they had secured the result of their labors, the conviction that something more was necessary in the way of constitutional protection to the unfortunate race who had suffered so much. They accordingly passed through Congress the proposition for the fourteenth amendment, and they declined to treat as restored to their full participation in the government of the Union the States which had been in insurrection, until they

ratified that article by a formal vote of their legislative bodies.

Before we proceed to examine more critically the provisions of this amendment, on which the plaintiffs in error rely, let us complete and dismiss the history of the recent amendments, as that history relates to the general purpose which pervades them all. A few years' experience satisfied the thoughtful men who had been the authors of the other two amendments that, notwithstanding the restraints of those articles on the States, and the laws passed under the additional powers granted to Congress, these were inadequate for the protection of life, liberty, and property, without which freedom to the slave was no boon. They were in all those States denied the right of suffrage. The laws were administered by the white man alone. It was urged that a race of men distinctively marked as was the negro, living in the midst of another and dominant race, could never be fully secured in their person and their property without the right of suffrage.

Hence the fifteenth amendment, which declares that "the right of a citizen of the United States to vote shall not be denied or abridged by any State on account of race, color, or previous condition of servitude." The negro having, by the fourteenth amendment, been declared to be a citizen of the United States, is thus made a voter in every State of the Union.

We repeat, then, in the light of this recapitulation of events, almost too recent to be called history, but which are familiar to us all; and on the most casual examination of the language of these amendments, no one can fail to be impressed with the one pervading purpose found in them all, lying at the foundation of each, and without which none of them would have been even suggested; we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him. It is true that only the fifteenth amendment, in terms,

mentions the negro by speaking of his color and his slavery. But it is just as true that each of the other articles was addressed to the grievances of that race, and designed to remedy them as the fifteenth.

We do not say that no one else but the negro can share in this protection. Both the language and spirit of these articles are to have their fair and just weight in any question of construction. Undoubtedly while negro slavery alone was in the mind of the Congress which proposed the thirteenth article, it forbids any other kind of slavery, now or hereafter. If Mexican peonage or the Chinese coolie labor system shall develop slavery of the Mexican or Chinese race within our territory, this amendment may safely be trusted to make it void. And so if other rights are assailed by the States which properly and necessarily fall within the protection of these articles, that protection will apply, though the party interested may not be of African descent. But what we do say, and what we wish to be understood is, that in any fair and just construction of any section or phrase of these amendments, it is necessary to look to the purpose which we have said was the pervading spirit of them all, the evil which they were designed to remedy, and the process of continued addition to the Constitution, until that purpose was supposed to be accomplished, as far as constitutional law can accomplish it.

The first section of the fourteenth article, to which our attention is more specially invited, opens with a definition of citizenship—not only citizenship of the United States, but citizenship of the States. No such definition was previously found in the Constitution, nor had any attempt been made to define it by act of Congress. It had been the occasion of much discussion in the courts, by the executive departments, and in the public journals. It had been said by eminent judges that no man was a citizen of the United States, except as he was a citizen of one of the States composing the Union. Those, therefore, who had been born and resided always in the District of Columbia or in the Territories, though within the United States, were not citizens. Whether

this proposition was sound or not had never been judicially decided. But it had been held by this court, in the celebrated Dred Scott case, only a few years before the outbreak of the civil war, that a man of African descent, whether a slave or not, was not and could not be a citizen of a State or of the United States. This decision, while it met the condemnation of some of the ablest statesmen and constitutional lawyers of the country, had never been overruled; and if it was to be accepted as a constitutional limitation of the right of citizenship, then all the negro race who had recently been made freemen, were still, not only not citizens, but were incapable of becoming so by anything short of an amendment to the Constitution.

To remove this difficulty primarily, and to establish a clear and comprehensive definition of citizenship which should declare what should constitute citizenship of the United States, and also citizenship of a State, the first clause of the first section was framed.

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

The first observation we have to make on this clause is, that it puts at rest both the questions which we stated to have been the subject of differences of opinion. It declares that persons may be citizens of the United States without regard to their citizenship of a particular State, and it overturns the Dred Scott decision by making *all persons* born within the United States and subject to its jurisdiction citizens of the United States. That its main purpose was to establish the citizenship of the negro can admit of no doubt. The phrase, "subject to its jurisdiction" was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign States born within the United States.

The next observation is more important in view of the arguments of counsel in the present case. It is, that the distinction between citizenship of the United States and citizenship of a State is clearly recognized and established.

· Not only may a man be a citizen of the United States without being a citizen of a State, but an important element is necessary to convert the former into the latter. He must reside within the State to make him a citizen of it, but it is only necessary that he should be born or naturalized in the United States to be a citizen of the Union.

It is quite clear, then, that there is a citizenship of the United States, and a citizenship of a State, which are distinct from each other, and which depend upon different characteristics or circumstances in the individual.

We think this distinction and its explicit recognition in this amendment of great weight in this argument, because the next paragraph of this same section, which is the one mainly relied on by the plaintiffs in error, speaks only of privileges and immunities of citizens of the United States, and does not speak of those of citizens of the several States. The argument, however, in favor of the plaintiffs rests wholly on the assumption that the citizenship is the same, and the privileges and immunities guaranteed by the clause are the same.

The language is, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of *the United States.*" · It is a little remarkable, if this clause was intended as a protection to the citizen of a State against the legislative power of his own State, that the word citizen of the State should be left out when it is so carefully used, and used in contradistinction to citizens of the United States, in the very sentence which precedes it. . It is too clear for argument that the change in phraseology was adopted understandingly and with a purpose.

Of the privileges and immunities of the citizen of the United States, and of the privileges and immunities of the citizen of the State, and what they respectively are, we will presently consider; but we wish to state here that it is only the former which are placed by this clause under the protection of the Federal Constitution, and that the latter, whatever they may be, are not intended to have any additional protection by this paragraph of the amendment.

If, then, there is a difference between the privileges and immunities belonging to a citizen of the United States as such, and those belonging to the citizen of the State as such the latter must rest-for their security and protection where they have heretofore rested; for they are not embraced by this paragraph of the amendment.

The first occurrence of the words "privileges and immunities" in our constitutional history, is to be found in the fourth of the articles of the old Confederation.

It declares "that the better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States, paupers, vagabonds, and fugitives from justice excepted, shall be entitled to all the privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions, and restrictions as the inhabitants thereof respectively."

In the Constitution of the United States, which superseded the Articles of Confederation, the corresponding provision is found in section two of the fourth article, in the following words: "The citizens of each State shall be entitled to all the privileges and immunities of citizens of the several States."

There can be but little question that the purpose of both these provisions is the same, and that the privileges and immunities intended are the same in each. In the article of the Confederation we have some of these specifically mentioned, and enough perhaps to give some general idea of the class of civil rights meant by the phrase.

Fortunately we are not without judicial construction of this clause of the Constitution. The first and the leading case on the subject is that of *Corfield* v. *Coryell*, decided by Mr. Justice Washington in the Circuit Court for the District of Pennsylvania in 1823.*

_____

* 4 Washington's Circuit Court, 371.

"The inquiry," he says, "is, what are the privileges and immunities of citizens of the several States? We feel no hesitation in confining these expressions to those privileges and immunities which are *fundamental;* which belong of right to the citizens of all free governments, and which ha.e at all times been enjoyed by citizens of the several States which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would be more tedious than difficult to enumerate. They may all, however, be comprehended under the following general heads: protection by the government, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may prescribe for the general good of the whole."

This definition of the privileges and immunities of citizens of the States is adopted in the main by this court in the recent case of *Ward* v. *The State of Maryland,** while it declines to undertake an authoritative definition beyond what was necessary to that decision. The description, when taken to include others not named, but which are of the same general character, embraces nearly every civil right for the establishment and protection of which organized government is instituted. They are, in the language of Judge Washington, those rights which are fundamental. Throughout his opinion, they are spoken of as rights belonging to the individual as a citizen of a State. They are so spoken of in the constitutional provision which he was construing. And they have always been held to be the class of rights which the State governments were created to establish and secure.

In the case of *Paul* v. *Virginia,†* the court, in expounding this clause of the Constitution, says that "the privileges and immunities secured to citizens of each State in the several States, by the provision in question, are those privileges and immunities which are common to the citizens in the latter

* 12 Wallace, 430.                    † 8 Id. 180.

States under their constitution and laws by virtue of their being citizens."

The constitutional provision there alluded to did not create those rights, which it called privileges and immunities of citizens of the States. It threw around them in that clause no security for the citizen of the State in which they were claimed or exercised. Nor did it profess to control the power of the State governments over the rights of its own citizens.

Its sole purpose was to declare to the several States, that whatever those rights, as you grant or establish them to your own citizens, or as you limit or qualify, or impose restrictions on their exercise, the same, neither more nor less, shall be the measure of the rights of citizens of other States within your jurisdiction.

It would be the vainest show of learning to attempt to prove by citations of authority, that up to the adoption of the recent amendments, no claim or pretence was set up that those rights depended on the Federal government for their existence or protection, beyond the very few express limitations which the Federal Constitution imposed upon the States—such, for instance, as the prohibition against ex post facto laws, bills of attainder, and laws impairing the obligation of contracts. But with the exception of these and a few other restrictions, the entire domain of the privileges and immunities of citizens of the States, as above defined, lay within the constitutional and legislative power of the States, and without that of the Federal government. Was it the purpose of the fourteenth amendment, by the simple declaration that no State should make or enforce any law which shall abridge the privileges and immunities of *citizens of the United States*, to transfer the security and protection of all the civil rights which we have mentioned, from the States to the Federal government? And where it is declared that Congress shall have the power to enforce that article, was it intended to bring within the power of Congress the entire domain of civil rights heretofore belonging exclusively to the States?

All this and more must follow, if the proposition of the

plaintiffs in error be sound.   For not only are these rights
subject to the control of Congress whenever in its discretion
any of them are supposed to be abridged by State legislation,
but that body may also pass laws in advance, limiting and
restricting the exercise of legislative power by the States, in
their most ordinary and usual functions, as in its judgment
it may think proper on all such subjects.   And still further,
such a construction followed by the reversal of the judg-
ments of the Supreme Court of Louisiana in these cases,
would constitute this court a perpetual censor upon all legis-
lation of the States, on the civil rights of their own citizens,
with authority to nullify such as it did not approve as con-
sistent with those rights, as they existed at the time of the
adoption of this amendment.   The argument we admit is
not always the most conclusive which is drawn from the
consequences urged against the adoption of a particular
construction of an instrument.   But when, as in the case
before us, these consequences are so serious, so far-reaching
and pervading, so great a departure from the structure and
spirit of our institutions; when the effect is to fetter and
degrade the State governments by subjecting them to the
control of Congress, in the exercise of powers heretofore
universally conceded to them of the most ordinary and fun-
damental character; when in fact it radically changes the
whole theory of the relations of the State and Federal gov-
ernments to each other and of both these governments to the
people; the argument has a force that is irresistible, in the
absence of language which expresses such a purpose too
clearly to admit of doubt.

We are convinced that no such results were intended by
the Congress which proposed these amendments, nor by the
legislatures of the States which ratified them.

Having shown that the privileges and immunities relied
on in the argument are those which belong to citizens of
the States as such, and that they are left to the State gov-
ernments for security and protection, and not by this article
placed under the special care of the Federal government,
we may hold ourselves excused from defining the privileges

and immunities of citizens of the United States which no State can abridge, until some case involving those privileges may make it necessary to do so.

But lest it should be said that no such privileges and immunities are to be found if those we have been considering are excluded, we venture to suggest some which owe their existence to the Federal government, its National character, its Constitution, or its laws.

One of these is well described in the case of *Crandall* v. *Nevada*.* It is said to be the right of the citizen of this great country, protected by implied guarantees of its Constitution, "to come to the seat of government to assert any claim he may have upon that government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions. He has the right of free access to its seaports, through which all operations of foreign commerce are conducted, to the sub-treasuries, land offices, and courts of justice in the several States." And quoting from the language of Chief Justice Taney in another case, it is said " that *for all the great purposes for which the Federal government* was established, we are one people, with one common country, *we are all citizens of the United States;*" and it is, as such citizens, that their rights are supported in this court in *Crandall* v. *Nevada.*

Another privilege of a citizen of the United States is to demand the care and protection of the Federal government over his life, liberty, and property when on the high seas or within the jurisdiction of a foreign government. Of this there can be no doubt, nor that the right depends upon his character as a citizen of the United States. The right to peaceably assemble and petition for redress of grievances, the privilege of the writ of *habeas corpus*, are rights of the citizen guaranteed by the Federal Constitution. The right to use the navigable waters of the United States, however they may penetrate the territory of the several States, all rights secured to our citizens by treaties with foreign nations,

---

* 6 Wallace, 36.

are dependent upon citizenship of the United States, and not citizenship of a State. One of these privileges is conferred by the very article under consideration. It is that a citizen of the United States can, of his own volition, become a citizen of any State of the Union by a *bonâ fide* residence therein, with the same rights as other citizens of that State. To these may be added the rights secured by the thirteenth and fifteenth articles of amendment, and by the other clause of the fourteenth, next to be considered.

But it is useless to pursue this branch of the inquiry, since we are of opinion that the rights claimed by these plaintiffs in error, if they have any existence, are not privileges and immunities of citizens of the United States within the meaning of the clause of the fourteenth amendment under consideration.

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of its laws."

The argument has not been much pressed in these cases that the defendant's charter deprives the plaintiffs of their property without due process of law, or that it denies to them the equal protection of the law. The first of these paragraphs has been in the Constitution since the adoption of the fifth amendment, as a restraint upon the Federal power. It is also to be found in some form of expression in the constitutions of nearly all the States, as a restraint upon the power of the States. This law then, has practically been the same as it now is during the existence of the government, except so far as the present amendment may place the restraining power over the States in this matter in the hands of the Federal government.

We are not without judicial interpretation, therefore, both State and National, of the meaning of this clause. And it

is sufficient to say that under no construction of that provision that we have ever seen, or any that we deem admissible, can the restraint imposed by the State of Louisiana upon the exercise of their trade by the butchers of New Orleans be held to be a deprivation of property within the meaning of that provision.

"Nor shall any State deny to any person within its jurisdiction the equal protection of the laws."

In the light of the history of these amendments, and the pervading purpose of them, which we have already discussed, it is not difficult to give a meaning to this clause. The existence of laws in the States where the newly emancipated negroes resided, which discriminated with gross injustice and hardship against them as a class, was the evil to be remedied by this clause, and by it such laws are forbidden.

If, however, the States did not conform their laws to its requirements, then by the fifth section of the article of amendment Congress was authorized to enforce it by suitable legislation. We doubt very much whether any action of a State not directed by way of discrimination against the negroes as a class, or on account of their race, will ever be held to come within the purview of this provision. It is so clearly a provision for that race and that emergency, that a strong case would be necessary for its application to any other. But as it is a State that is to be dealt with, and not alone the validity of its laws, we may safely leave that matter until Congress shall have exercised its power, or some case of State oppression, by denial of equal justice in its courts, shall have claimed a decision at our hands. We find no such case in the one before us, and do not deem it necessary to go over the argument again, as it may have relation to this particular clause of the amendment.

In the early history of the organization of the government, its statesmen seem to have divided on the line which should separate the powers of the National government from those of the State governments, and though this line has

never been very well defined in public opinion, such a division has continued from that day to this.

The adoption of the first eleven amendments to the Constitution so soon after the original instrument was accepted, shows a prevailing sense of danger at that time from the Federal power. And it cannot be denied that such a jealousy continued to exist with many patriotic men until the breaking out of the late civil war. It was then discovered that the true danger to the perpetuity of the Union was in the capacity of the State organizations to combine and concentrate all the powers of the State, and of contiguous States, for a determined resistance to the General Government.

Unquestionably this has given great force to the argument, and added largely to the number of those who believe in the necessity of a strong National government.

But, however pervading this sentiment, and however it may have contributed to the adoption of the amendments we have been considering, we do not see in those amendments any purpose to destroy the main features of the general system. Under the pressure of all the excited feeling growing out of the war, our statesmen have still believed that the existence of the States with powers for domestic and local government, including the regulation of civil rights—the rights of person and of property—was essential to the perfect working of our complex form of government, though they have thought proper to impose additional limitations on the States, and to confer additional power on that of the Nation.

But whatever fluctuations may be seen in the history of public opinion on this subject during the period of our national existence, we think it will be found that this court, so far as its functions required, has always held with a steady and an even hand the balance between State and Federal power, and we trust that such may continue to be the history of its relation to that subject so long as it shall have duties to perform which demand of it a construction of the Constitution, or of any of its parts.

The judgments of the Supreme Court of Louisiana in these cases are

AFFIRMED.

Mr. Justice FIFLD, dissenting:

I am unable to agree with the majority of the court in these cases, and will proceed to state the reasons of my dissent from their judgment.

The cases grow out of the act of the legislature of the State of Louisiana, entitled "An act to protect the health of the city of New Orleans, to locate the stock-landings and slaughter-houses, and to incorporate 'The Crescent City Live-Stock Landing and Slaughter-House Company,'" which was approved on the eighth of March, 1869, and went into operation on the first of June following. The act creates the corporation mentioned in its title, which is composed of seventeen persons designated by name, and invests them and their successors with the powers usually conferred upon corporations in addition to their special and exclusive privileges. It first declares that it shall not be lawful, after the first day of June, 1869, to "land, keep, or slaughter any cattle, beeves, calves, sheep, swine, or other animals, or to have, keep, or establish any stock-landing, yards, slaughter-houses, or abattoirs within the city of New Orleans or the parishes of Orleans, Jefferson, and St. Bernard," except as provided in the act; and imposes a penalty of two hundred and fifty dollars for each violation of its provisions. It then authorizes the corporation mentioned to establish and erect within the parish of St. Bernard and the corporate limits of New Orleans, below the United States barracks, on the east side of the Mississippi, or at any point below a designated railroad depot on the west side of the river, "wharves, stables, sheds, yards, and buildings, necessary to land, stable, shelter, protect, and preserve all kinds of horses, mules, cattle, and other animals," and provides that cattle and other animals, destined for sale or slaughter in the city of New Orleans or its environs, shall be landed at the landings and yards of the company, and be there

yarded, sheltered, and protected, if necessary; and that the company shall be entitled to certain prescribed fees for the use of its wharves, and for each animal landed, and be authorized to detain the animals until the fees are paid, and if not paid within fifteen days to take proceedings for their sale. Every person violating any of these provisions, or landing, yarding, or keeping animals elsewhere, is subjected to a fine of two hundred and fifty dollars.

The act then requires the corporation to erect a grand slaughter-house of sufficient dimensions to accommodate all butchers, and in which five hundred animals may be slaughtered a day, with a sufficient number of sheds and stables for the stock received at the port of New Orleans, at the same time authorizing the company to erect other landing-places and other slaughter-houses at any points consistent with the provisions of the act.

The act then provides that when the slaughter-houses and accessory buildings have been completed and thrown open for use, public notice thereof shall be given for thirty days, and within that time " all other stock-landings and slaughter-houses within the parishes of Orleans, Jefferson, and St. Bernard shall be closed, and it shall no longer be lawful to slaughter cattle, hogs, calves, sheep, or goats, the meat of which is determined [destined] for sale within the parishes aforesaid, under a penalty of one hundred dollars for each and every offence."

The act then provides that the company shall receive for every animal slaughtered in its buildings certain prescribed fees, besides the head, feet, gore, and entrails of all animals except of swine.

Other provisions of the act require the inspection of the animals before they are slaughtered, and allow the construction of railways to facilitate communication with the buildings of the company and the city of New Orleans.

But it is only the special and exclusive privileges conferred by the act that this court has to consider in the cases before it. These privileges are granted for the period of twenty-five years. Their exclusive character not only fol-

lows from the provisions I have cited, but it is declared in express terms in the act. In the third section the language is that the corporation " shall have the *sole and exclusive privilege* of conducting and carrying on the live-stock, landing, and slaughter-house business within the limits and privileges granted by the provisions of the act." And in the fourth section the language is, that after the first of June, 1869, the company shall have " the exclusive privilege of having landed at their landing-places all animals intended for sale or slaughter in the parishes of Orleans and Jefferson," and " the exclusive privilege of having slaughtered " in its slaughter-houses all animals, the meat of which is intended for sale in these parishes.

In order to understand the real character of these special privileges, it is necessary to know the extent of country and of population which they affect. The parish of Orleans contains an area of country of 150 square miles; the parish of Jefferson, 384 square miles; and the parish of St. Bernard, 620 square miles. The three parishes together contain an area of 1154 square miles, and they have a population of between two and three hundred thousand people.

The plaintiffs in error deny the validity of the act in question, so far as it confers the special and exclusive privileges mentioned. The first case before us was brought by an association of butchers in the three parishes against the corporation, to prevent the assertion and enforcement of these privileges. The second case was instituted by the attorney-general of the State, in the name of the State, to protect the corporation in the enjoyment of these privileges, and to prevent an association of stock-dealers and butchers from acquiring a tract of land in the same district with the corporation, upon which to erect suitable buildings for receiving, keeping, and slaughtering cattle, and preparing animal food for market. The third case was commenced by the corporation itself, to restrain the defendants from carrying on a business similar to its own, in violation of its alleged exclusive privileges.

The substance of the averments of the plaintiffs in error

is this: That prior to the passage of the act in question they were engaged in the lawful and necessary business of procuring and bringing to the parishes of Orleans, Jefferson, and St. Bernard, animals suitable for human food, and in preparing such food for market; that in the prosecution of this business they had provided in these parishes suitable establishments for landing, sheltering, keeping, and slaughtering cattle and the sale of meat; that with their association about four hundred persons were connected, and that in the parishes named about a thousand persons were thus engaged in procuring, preparing, and selling animal food. And they complain that the business of landing, yarding, and keeping, within the parishes named, cattle intended for sale or slaughter, which was lawful for them to pursue before the first day of June, 1869, is made by that act unlawful for any one except the corporation named; and that the business of slaughtering cattle and preparing animal food for market, which it was lawful for them to pursue in these parishes before that day, is made by that act unlawful for them to pursue afterwards, except in the buildings of the company, and upon payment of certain prescribed fees, and a surrender of a valuable portion of each animal slaughtered. And they contend that the lawful business of landing, yarding, sheltering, and keeping cattle intended for sale or slaughter, which they in common with every individual in the community of the three parishes had a right to follow, cannot be thus taken from them and given over for a period of twenty-five years to the sole and exclusive enjoyment of a corporation of seventeen persons or of anybody else. And they also contend that the lawful and necessary business of slaughtering cattle and preparing animal food for market, which they and all other individuals had a right to follow, cannot be thus restricted within this territory of 1154 square miles to the buildings of this corporation, or be subjected to tribute for the emolument of that body.

No one will deny the abstract justice which lies in the position of the plaintiffs in error; and I shall endeavor to

show that the position has some support in the fundamental law of the country.

It is contended in justification for the act in question that it was adopted in the interest of the city, to promote its cleanliness and protect its health, and was the legitimate exercise of what is termed the police power of the State. That power undoubtedly extends to all regulations affecting the health, good order, morals, peace, and safety of society, and is exercised on a great variety of subjects, and in almost numberless ways. All sorts of restrictions and burdens are imposed under it, and when these are not in conflict with any constitutional prohibitions, or fundamental principles, they cannot be successfully assailed in a judicial tribunal. With this power of the State and its legitimate exercise I shall not differ from the majority of the court. But under the pretence of prescribing a police regulation the State cannot be permitted to encroach upon any of the just rights of the citizen, which the Constitution intended to secure against abridgment.

In the law in question there are only two provisions which can properly be called police regulations—the one which requires the landing and slaughtering of animals below the city of New Orleans, and the other which requires the inspection of the animals before they are slaughtered. When these requirements are complied with, the sanitary purposes of the act are accomplished. In all other particulars the act is a mere grant to a corporation created by it of special and exclusive privileges by which the health of the city is in no way promoted. It is plain that if the corporation can, without endangering the health of the public, carry on the business of landing, keeping, and slaughtering cattle within a district below the city embracing an area of over a thousand square miles, it would not endanger the public health if other persons were also permitted to carry on the same business within the same district under similar conditions as to the inspection of the animals. The health of the city might require the removal from its limits and suburbs of all buildings for keeping and slaughtering cattle, but no such

object could possibly justify legislation removing such build-
ings from a large part of the State for the benefit of a single
corporation. The pretence of sanitary regulations for the
grant of the exclusive privileges is a shallow one, which
merits only this passing notice.

It is also sought to justify the act in question on the same
principle that exclusive grants for ferries, bridges, and turn-
pikes are sanctioned. But it can find no support there.
Those grants are of franchises of a public character apper-
taining to the government. Their use usually requires the
exercise of the sovereign right of eminent domain. It is for
the government to determine when one of them shall be
granted, and the conditions upon which it shall be enjoyed.
It is the duty of the government to provide suitable roads,
bridges, and ferries for the convenience of the public, and
if it chooses to devolve this duty to any extent, or in any
locality, upon particular individuals or corporations, it may
of course stipulate for such exclusive privileges connected
with the franchise as it may deem proper, without encroach-
ing· upon the freedom or the just rights of others. The
grant, with exclusive privileges, of a right thus appertaining
to the government, is a very different thing from a grant,
with exclusive privileges, of a right to pursue one of the
ordinary trades or callings of life, which is a right apper-
taining solely to the individual.

Nor is there any analogy between this act of Louisiana
and the legislation which confers upon the inventor of a new
and useful improvement an exclusive right to make and sell
to others his invention. The government in this way only
secures to the inventor the temporary enjoyment of that
which, without him, would not have existed. It thus only
recognizes in the inventor a temporary property in the prod-
uct of his own brain.

The act of Louisiana presents the naked case, unaccom-
panied by any public considerations, where a right to pursue
a lawful and necessary calling, previously enjoyed by every
citizen, and in connection with which a thousand persons
were daily employed, is taken away and vested exclusively

for twenty-five years, for an extensive district and a large population, in a single corporation, or its exercise is for that period restricted to the establishments of the corporation, and there allowed only upon onerous conditions.

If exclusive privileges of this character can be granted to a corporation of seventeen persons, they may, in the discretion of the legislature, be equally granted to a single individual. If they may be granted for twenty-five years they may be equally granted for a century, and in perpetuity. If they may be granted for the landing and keeping of animals intended for sale or slaughter they may be equally granted for the landing and storing of grain and other products of the earth, or for any article of commerce. If they may be granted for structures in which animal food is prepared for market they may be equally granted for structures in which farinaceous or vegetable food is prepared. They may be granted for any of the pursuits of human industry, even in its most simple and common forms. Indeed, upon the theory on which the exclusive privileges granted by the act in question are sustained, there is no monopoly, in the most odious form, which may not be upheld.

The question presented is, therefore, one of the gravest importance, not merely to the parties here, but to the whole country. It is nothing less than the question whether the recent amendments to the Federal Constitution protect the citizens of the United States against the deprivation of their common rights by State legislation. In my judgment the fourteenth amendment does afford such protection, and was so intended by the Congress which framed and the States which adopted it.

The counsel for the plaintiffs in error have contended, with great force, that the act in question is also inhibited by the thirteenth amendment.

That amendment prohibits slavery and involuntary servitude, except as a punishment for crime, but I have not supposed it was susceptible of a construction which would cover the enactment in question. I have been so accustomed to regard it as intended to meet that form of slavery which had

previously prevailed in this country, and to which the recent civil war owed its existence, that I was not prepared, nor am I yet, to give to it the extent and force ascribed by counsel. Still it is evident that the language of the amendment is not used in a restrictive sense. It is not confined to African slavery alone. It is general and universal in its application. Slavery of white men as well as of black men is prohibited, and not merely slavery in the strict sense of the term, but involuntary servitude in every form.

The words "involuntary servitude" have not been the subject of any judicial or legislative exposition, that I am aware of, in this country, except that which is found in the Civil Rights Act, which will be hereafter noticed. It is, however, clear that they include something more than slavery in the strict sense of the term; they include also serfage, vassalage, villenage, peonage, and all other forms of compulsory service for the mere benefit or pleasure of others. Nor is this the full import of the terms. The abolition of slavery and involuntary servitude was intended to make every one born in this country a freeman, and as such to give to him the right to pursue the ordinary avocations of life without other restraint than such as affects all others, and to enjoy equally with them the fruits of his labor. A prohibition to him to pursue certain callings, open to others of the same age, condition, and sex, or to reside in places where others are permitted to live, would so far deprive him of the rights of a freeman, and would place him, as respects others, in a condition of servitude. A person allowed to pursue only one trade or calling, and only in one locality of the country, would not be, in the strict sense of the term, in a condition of slavery, but probably none would deny that he would be in a condition of servitude. He certainly would not possess the liberties nor enjoy the privileges of a freeman. The compulsion which would force him to labor even for his own benefit only in one direction, or in one place, would be almost as oppressive and nearly as great an invasion of his liberty as the compulsion which would force him to labor for the benefit or pleasure of another,

.and would equally constitute an element of servitude. The counsel of the plaintiffs in error therefore contend that " wherever a law of a State, or a law of the United States, makes a discrimination between classes of persons, which deprives the one class of their freedom or their property, or which makes a caste of them to subserve the power, pride, avarice, vanity, or vengeance of others," there involuntary servitude exists within the meaning of the thirteenth amendment.

It is not necessary, in my judgment, for the disposition of the present case in favor of the plaintiffs in error, to accept as entirely correct this conclusion of counsel. It, however, finds support in the act of Congress known as the Civil Rights Act, which was framed and adopted upon a construction of the thirteenth amendment, giving to its language a similar breadth. That amendment was ratified on the eighteenth of December, 1865,* and in April of the following year the Civil Rights Act was passed.† Its first section declares that all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are " citizens of the United States," and that " such citizens, of every race and color, without regard to any previous condition of slavery, or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall have the same right in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as enjoyed by white citizens."

This legislation was supported upon the theory that citizens of the United States as such were entitled to the rights and privileges enumerated, and that to deny to any such citizen equality in these rights and privileges with others, was, to the extent of the denial, subjecting him to an invol-

---

* The proclamation of its ratification was made on that day (13 Stat. at Large, 774).

† 14 Id. 27.

untary servitude. Senator Trumbull, who drew the act and who was its earnest advocate in the Senate, stated, on opening the discussion upon it in that body, that the measure was intended to give effect to the declaration of the amendment, and to secure to all persons in the United States practical freedom. After referring to several statutes passed in some of the Southern States, discriminating between the freedmen and white citizens, and after citing the definition of civil liberty given by Blackstone, the Senator said: "I take it that any statute which is not equal to all, and which deprives any citizen of civil rights, which are secured to other citizens, is an unjust encroachment upon his liberty; and it is in fact a badge of servitude which by the Constitution is prohibited."*

By the act of Louisiana, within the three parishes named, a territory exceeding one thousand one hundred square miles, and embracing over two hundred thousand people, every man who pursues the business of preparing animal food for market must take his animals to the buildings of the favored company, and must perform his work in them, and for the use of the buildings must pay a prescribed tribute to the company, and leave with it a valuable portion of each animal slaughtered. Every man in these parishes who has a horse or other animal for sale, must carry him to the yards and stables of this company, and for their use pay a like tribute. He is not allowed to do his work in his own buildings, or to take his animals to his own stables or keep them in his own yards, even though they should be erected in the same district as the buildings, stables, and yards of the company, and that district embraces over eleven hundred square miles. The prohibitions imposed by this act upon butchers and dealers in cattle in these parishes, and the special privileges conferred upon the favored corporation, are similar in principle and as odious in character as the restrictions imposed in the last century upon the peasantry in some parts of France, where, as says a French

---

* Congressional Globe, 1st Session, 39th Congress, part 1, page 474

writer, the peasant was prohibted "to hunt on his own lands, to fish in his own waters, to grind at his own mill, to cook at his own oven, to dry his clothes on his own machines, to whet his instruments at his own grindstone, to make his own wine, his oil, and his cider at his own press, . . . or to sell his commodities at the public market." The exclusive right to all these privileges was vested in the lords of the vicinage. "The history of the most execrable tyranny of ancient times," says the same writer, " offers nothing like this. This category of oppressions cannot be applied to a free man, or to the peasant, except in violation of his rights."

, But if the exclusive privileges conferred upon the Louisiana corporation can be sustained, it is not perceived why exclusive privileges for the construction and keeping of ovens, machines, grindstones, wine-presses, and for all the numerous trades and pursuits for the prosecution of which buildings are required, may not be equally bestowed upon other corporations or private individuals, and for periods of indefinite duration.

It is not necessary, however, as I have said, to rest my objections to the act in question upon the terms and meaning of the thirteenth amendment. The provisions of the fourteenth amendment, which is properly a supplement to the thirteenth, cover, in my judgment, the case before us, and inhibit any legislation which confers special and exclusive privileges like these under consideration. The amendment was adopted to obviate objections which had been raised and pressed with great force to the validity of the Civil Rights Act, and to place the common rights of American citizens under the protection of the National government. It first declares that " all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." It then declares that " no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property, without due

process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The first clause of this amendment determines who are citizens of the United States, and how their citizenship is created. Before its enactment there was much diversity of opinion among jurists and statesmen whether there was any such citizenship independent of that of the State, and, if any existed, as to the manner in which it originated. With a great number the opinion prevailed that there was no such citizenship independent of the citizenship of the State. Such was the opinion of Mr. Calhoun and the class represented by him. In his celebrated speech in the Senate upon the Force Bill, in 1833, referring to the reliance expressed by a senator upon the fact that we are citizens of the United States, he said : "If by citizen of the United States he means a citizen at large, one whose citizenship extends to the entire geographical limits of the country without having a local citizenship in some State or Territory, a sort of citizen of the world, all I have to say is that such a citizen would be a perfect nondescript; that not a single individual of this description can be found in the entire mass of our population. Notwithstanding all the pomp and display of eloquence on the occasion, every citizen is a citizen of some State or Territory, and as such, under an express provision of the Constitution, is entitled to all privileges and immunities of citizens in the several States; and it is in this and no other sense that we are citizens of the United States."*

In the Dred Scott case this subject of citizenship of the United States was fully and elaborately discussed. The exposition in the opinion of Mr. Justice Curtis has been generally accepted by the profession of the country as the one containing the soundest views of constitutional law. And he held that, under the Constitution, citizenship of the United States in reference to natives was dependent upon citizenship in the several States, under their constitutions and laws.

---

* Calhoun's Works, vol. 2, p. 242.

The Chief Justice, in that case, and a majority of the court with him, held that the words "people of the United States" and "citizens" were synonymous terms; that the people of the respective States were the parties to the Constitution; that these people consisted of the free inhabitants of those States; that they had provided in their Constitution for the adoption of a uniform rule of naturalization; that they and their descendants and persons naturalized were the only persons who could be citizens of the United States, and that it was not in the power of any State to invest any other person with citizenship so that he could enjoy the privileges of a citizen under the Constitution, and that therefore the descendants of persons brought to this country and sold as slaves were not, and could not be citizens within the meaning of the Constitution.

The first clause of the fourteenth amendment changes this whole subject, and removes it from the region of discussion and doubt. It recognizes in express terms, if it does not create, citizens of the United States, and it makes their citizenship dependent upon the place of their birth, or the fact of their adoption, and not upon the constitution or laws of any State or the condition of their ancestry. A citizen of a State is now only a citizen of the United States residing in that State. The fundamental rights, privileges, and immunities which belong to him as a free man and a free citizen, now belong to him as a citizen of the United States, and are not dependent upon his citizenship of any State. The exercise of these rights and privileges, and the degree of enjoyment received from such exercise, are always more or less affected by the condition and the local institutions of the State, or city, or town where he resides. They are thus affected in a State by the wisdom of its laws, the ability of its officers, the efficiency of its magistrates, the education and morals of its people, and by many other considerations. This is a result which follows from the constitution of society, and can never be avoided, but in no other way can they be affected by the action of the State, or by the residence of the citizen therein. They do not derive

their existence from its legislation, and cannot be destroyed by its power.

The amendment does not attempt to confer any new privileges or immunities upon citizens, or to enumerate or define those already existing. It assumes that there are such privileges and immunities which belong of right to citizens as such, and ordains that they shall not be abridged by State legislation. If this inhibition has no reference to privileges and immunities of this character, but only refers, as held by the majority of the court in their opinion, to such privileges and immunities as were before its adoption specially designated in the Constitution or necessarily implied as belonging to citizens of the United States, it was a vain and idle enactment, which accomplished nothing, and most unnecessarily excited Congress and the people on its passage. With privileges and immunities thus designated or implied no State could ever have interfered by its laws, and no new constitutional provision was required to inhibit such interference. The supremacy of the Constitution and the laws of the United States always controlled any State legislation of that character. But if the amendment refers to the natural and inalienable rights which belong to all citizens, the inhibition has a profound significance and consequence.

What, then, are the privileges and immunities which are secured against abridgment by State legislation?

In the first section of the Civil Rights Act Congress has given its interpretation to these terms, or at least has stated some of the rights which, in its judgment, these terms include; it has there declared that they include the right "to make and enforce contracts, to sue, be parties and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property." That act, it is true, was passed before the fourteenth amendment, but the amendment was adopted, as I have already said, to obviate objections to the act, or, speaking more accurately, I should say, to obviate objections to legis-

lation of a similar character, extending the protection of the National government over the common rights of all citizens of the United States.  Accordingly, after its ratification, Congress re-enacted the act under the belief that whatever doubts may have previously existed of its validity, they were removed by the amendment.*

The terms, privileges and immunities, are not new in the amendment; they were in the Constitution before the amendment was adopted.  They are found in the second section of the fourth article, which declares that " the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States," and they have been the subject of frequent consideration in judicial decisions.  In *Corfield* v. *Coryell*,† Mr. Justice Washington said he had " no hesitation in confining these expressions to those privileges and immunities which were, in their nature, fundamental; which belong of right to citizens of all free governments, and which have at all times been enjoyed by the citizens of the several States which compose the Union, from the time of their becoming free, independent, and sovereign ;" and, in considering what those fundamental privileges were, he said that perhaps it would be more tedious than difficult to enumerate them, but that they might be " all comprehended under the following general heads : protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may justly prescribe for the general good of the whole."  This appears to me to be a sound construction of the clause in question.  The privileges and immunities designated are those *which of right belong to the citizens of all free governments.*  Clearly among these must be placed the right to pursue a lawful employment in a lawful manner, without other restraint than such as equally affects all persons.  In the discus-

---

* May 31st, 1870; 16 Stat. at Large, 144.

† 4 Washington's Circuit Court, 380.

sions in Congress upon the passage of the Civil Rights Act repeated reference was made to this language of Mr. Justice Washington. It was cited by Senator Trumbull with the observation that it enumerated the very rights belonging to a citizen of the United States set forth in the first section of the act, and with the statement that all persons born in the United States, being declared by the act citizens of the United States, would thenceforth be entitled to the rights of citizens, and that these were the great fundamental rights set forth in the act; and that they were set forth "as appertaining to every freeman."

The privileges and immunities designated in the second section of the fourth article of the Constitution are, then, according to the decision cited, those which of right belong to the citizens of all free governments, and they can be enjoyed under that clause by the citizens of each State in the several States upon the same terms and conditions as they are enjoyed by the citizens of the latter States. No discrimination can be made by one State against the citizens of other States in their enjoyment, nor can any greater imposition be levied than such as is laid upon its own citizens. It is a clause which insures equality in the enjoyment of these rights between citizens of the several States whilst in the same State.

Nor is there anything in the opinion in the case of *Paul* v. *Virginia*,* which at all militates against these views, as is supposed by the majority of the court. The act of Virginia, of 1866, which was under consideration in that case, provided that no insurance company, not incorporated under the laws of the State, should carry on its business within the State without previously obtaining a license for that purpose; and that it should not receive such license until it had deposited with the treasurer of the State bonds of a specified character, to an amount varying from thirty to fifty thousand dollars. No such deposit was required of insurance companies incorporated by the State, for carrying on

* 8 Wallace, 168.

their business within the State; and in the case cited the validity of the discriminating provisions of the statute of Virginia between her own corporations and the corporations of other States, was assailed. It was contended that the statute in this particular was in conflict with that clause of the Constitution which declares that " the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." But the court answered, that corporations were not citizens within the meaning of this clause; that the term citizens as there used applied only to natural persons, members of the body politic owing allegiance to the State, not to artificial persons created by the legislature and possessing only the attributes which the legislature had prescribed; that though it had been held that where contracts or rights of property were to be enforced by or against a corporation, the courts of the United States would, for the purpose of maintaining jurisdiction, consider the corporation as representing citizens of the State, under the laws of which it was created, and to this extent would treat a corporation as a citizen within the provision of the Constitution extending the judicial power of the United States to controversies between citizens of different States, it had never been held in any case which had come under its observation, either in the State or Federal courts, that a corporation was a citizen within the meaning of the clause in question, entitling the citizens of each State to the privileges and immunities of citizens in the several States. And the court observed, that the privileges and immunities secured by that provision were those privileges and immunities which were common to the citizens in the latter States, under their constitution and laws, by virtue of their being citizens; that special privileges enjoyed by citizens in their own States were not secured in other States by the provision; that it was not intended by it to give to the laws of one State any operation in other States; that they could have no such operation except by the permission, expressed or implied, of those States; and that the special privileges which they conferred must, therefore, be enjoyed at home unless the assent

of other States to their enjoyment therein were given. And so the court held, that a corporation, being a grant of special privileges to the corporators, had no legal existence beyond the limits of the sovereignty where created, and that the recognition of its existence by other States, and the enforcement of its contracts made therein, depended purely upon the assent of those States, which could be granted upon such terms and conditions as those States might think proper to impose.

The whole purport of the decision was, that citizens of one State do not carry with them into other States any special privileges or immunities, conferred by the laws of their own States, of a corporate or other character. That decision has no pertinency to the questions involved in this case. The common privileges and immunities which of right belong to all citizens, stand on a very different footing. These the citizens of each State do carry with them into other States and are secured by the clause in question, in their enjoyment upon terms of equality with citizens of the latter States. This equality in one particular was enforced by this court in the recent case of *Ward* v. *The State of Maryland*, reported in the 12th of Wallace. A statute of that State required the payment of a larger sum from a non-resident trader for a license to enable him to sell his merchandise in the State, than it did of a resident trader, and the court held, that the statute in thus discriminating against the non-resident trader contravened the clause securing to the citizens of each State the privileges and immunities of citizens of the several States. The privilege of disposing of his property, which was an essential incident to his ownership, possessed by the non-resident, was subjected by the statute of Maryland to a greater burden than was imposed upon a like privilege of her own citizens. The privileges of the non-resident were in this particular abridged by that legislation.

What the clause in question did for the protection of the citizens of one State against hostile and discriminating legislation of other States, the fourteenth amendment does for

the protection of every citizen of the United States against hostile and discriminating legislation against him in favor of others, whether they reside in the same or in different States. If under the fourth article of the Constitution equality of privileges and immunities is secured between citizens of different States, under the fourteenth amendment the same equality is secured between citizens of the United States.

It will not be pretended that under the fourth article of the Constitution any State could create a monopoly in any known trade or manufacture in favor of her own citizens, or any portion of them, which would exclude an equal participation in the trade or manufacture monopolized by citizens of other States. She could not confer, for example, upon any of her citizens the sole right to manufacture shoes, or boots, or silk, or the sole right to sell those articles in the State so as to exclude non-resident citizens from engaging in a similar manufacture or sale. The non-resident citizens could claim equality of privilege under the provisions of the fourth article with the citizens of the State exercising the monopoly as well as with others, and thus, as respects them, the monopoly would cease. If this were not so it would be in the power of the State to exclude at any time the citizens of other States from participation in particular branches of commerce or trade, and extend the exclusion from time to time so as effectually to prevent any traffic with them.

Now, what the clause in question does for the protection of citizens of one State against the creation of monopolies in favor of citizens of other States, the fourteenth amendment does for the protection of every citizen of the United States against the creation of any monopoly whatever. The privileges and immunities of citizens of the United States, of every one of them, is secured against abridgment in any form by any State. The fourteenth amendment places them under the guardianship of the National authority. All monopolies in any known trade or manufacture are an invasion of these privileges, for they encroach upon the liberty of citizens to acquire property and pursue happiness, and were

held void at common law in the great *Case of Monopolies*, decided during the reign of Queen Elizabeth.

A monopoly is defined " to be an institution or allowance from the sovereign power of the State by grant, commission, or otherwise, to any person or corporation, for the sole buying, selling, making, working, or using of anything, whereby any person or persons, bodies politic or corporate, are sought to be restrained of any freedom or liberty they had before, or hindered in their lawful trade." All such grants relating to any known trade or manufacture have been held by all the judges of England, whenever they have come up for consideration, to be void at common law as destroying the freedom of trade, discouraging labor and industry, restraining persons from getting an honest livelihood, and putting it into the power of the grantees to enhance the price of commodities. The definition embraces, it will be observed, not merely the sole privilege of buying and selling particular articles, or of engaging in their manufacture, but also the sole privilege of using anything by which others may be restrained of the freedom or liberty they previously had in any lawful trade, or hindered in such trade. It thus covers in every particular the possession and use of suitable yards, stables, and buildings for keeping and protecting cattle and other animals, and for their slaughter. Such establishments are essential to the free and successful prosecution by any butcher of the lawful trade of preparing animal food for market. The exclusive privilege of supplying such yards, buildings, and other conveniences for the prosecution of this business in a large district of country, granted by the act of Louisiana to seventeen persons, is as much a monopoly as though the act had granted to the company the exclusive privilege of buying and selling the animals themselves. It equally restrains the butchers in the freedom and liberty they previously had, and hinders them in their lawful trade.

The reasons given for the judgment in the *Case of Monopolies* apply with equal force to the case at bar. In that case a patent had been granted to the plaintiff giving him the sole

right to import playing-cards, and the entire traffic in them, and the sole right to make such cards within the realm. The defendant, in disregard of this patent, made and sold some gross of such cards and imported others, and was accordingly sued for infringing upon the exclusive privileges of the plaintiff. As to a portion of the cards made and sold within the realm, he pleaded that he was a haberdasher in London and a free citizen of that city, and as such had a right to make and sell them. The court held the plea good and the grant void, as against the common law and divers acts of Parliament. "All trades," said the court, "as well mechanical as others, which prevent idleness (the bane of the commonwealth) and exercise men and youth in labor for the maintenance of themselves and their families, and for the increase of their substance, to serve the queen when occasion shall require, are profitable for the commonwealth, and therefore the grant to the plaintiff to have the sole making of them is *against the common law and the benefit and liberty of the subject.*"* The case of Davenant and Hurdis was cited in support of this position. In that case a company of merchant tailors in London, having power by charter to make ordinances for the better rule and government of the company, so that they were consonant to law and reason, made an ordinance that any brother of the society who should have any cloth dressed by a cloth-worker, not being a brother of the society, should put one-half of his cloth to some brother of the same society who exercised the art of a cloth-worker, upon pain of forfeiting ten shillings, "and it was adjudged that the ordinance, although it had the countenance of a charter, was against the common law, *because it was against the liberty of the subject; for every subject, by the law, has freedom and liberty to put his cloth to be dressed by what cloth-worker he pleases, and cannot be restrained to certain persons, for that in effect would be a monopoly,* and, therefore, such ordinance, by color of a charter or any grant by charter to such effect, would be void."

---

* Coke's Reports, part 11, page 86.

Although the court, in its opinion, refers to the increase in prices and deterioration in quality of commodities which necessarily result from the grant of monopolies, the main ground of the decision was their interference with the liberty of the subject to pursue for his maintenance and that of his family any lawful trade or employment. This liberty is assumed to be the natural right of every Englishman.

The struggle of the English people against monopolies forms one of the most interesting and instructive chapters in their history. It finally ended in the passage of the statute of 21st James I, by which it was declared "that all monopolies and all commissions, grants, licenses, charters, and letters-patent, to any person or persons, bodies politic or corporate, whatsoever, of or for the sole buying, selling, making, working, or using of anything" within the realm or the dominion of Wales were altogether contrary to the laws of the realm and utterly void, with the exception of patents for new inventions for a limited period, and for printing, then supposed to belong to the prerogative of the king, and for the preparation and manufacture of certain articles and ordnance intended for the prosecution of war.

The common law of England, as is thus seen, condemned all monopolies in any known trade or manufacture, and declared void all grants of special privileges whereby others could be deprived of any liberty which they previously had, or be hindered in their lawful trade. The statute of James I, to which I have referred, only embodied the law as it had been previously declared by the courts of England, although frequently disregarded by the sovereigns of that country.

The common law of England is the basis of the jurisprudence of the United States. It was brought to this country by the colonists, together with the English statutes, and was established here so far as it was applicable to their condition. That law and the benefit of such of the English statutes as existed at the time of their colonization, and which they had by experience found to be applicable to their circumstances, were claimed by the Congress of the United Colonies in 1774 as a part of their "indubitable rights and liber-

ties."*   Of the statutes, the benefits of which was thus claimed, the statute of James I against monopolies was one of the most important.   And when the Colonies separated from the mother country no privilege was more fully recognized or more completely incorporated into the fundamental law of the country than that every free subject in the British empire was entitled to pursue his happiness by following any of the known established trades and occupations of the country, subject only to such restraints as equally affected all others.   The immortal document which proclaimed the independence of the country declared as self-evident truths that the Creator had endowed all men " with certain inalienable rights, and that among these are life, liberty, and the pursuit of happiness; and that to secure these rights governments are instituted among men."

If it be said that the civil law and not the common law is the basis of the jurisprudence of Louisiana, I answer that the decree of Louis XVI, in 1776, abolished all monopolies of trades and all special privileges of corporations, guilds, and trading companies, and authorized every person to exercise, without restraint, his art, trade, or profession, and such has been the law of France and of her colonies ever since, and that law prevailed in Louisiana at the time of her cession to the United States.   Since then, notwithstanding the existence in that State of the civil law as the basis of her jurisprudence, freedom of pursuit has been always recognized as the common right of her citizens.   But were this otherwise, the fourteenth amendment secures the like protection to all citizens in that State against any abridgment of their common rights, as in other States.   That amendment was intended to give practical effect to the declaration of 1776 of inalienable rights, rights which are the gift of the Creator, which the law does not confer, but only recognizes.   If the trader in London could plead that he was a free citizen of that city against the enforcement to his injury of monopolies, surely under the fourteenth amendment every

* Journals of Congress, vol. i, pp. 28–30.

citizen of the United States should be able to plead his citizenship of the republic as a protection against any similar invasion of his privileges and immunities.

So fundamental has this privilege of every citizen to be free from disparaging and unequal enactments, in the pursuit of the ordinary avocations of life, been regarded, that few instances have arisen where the principle has been so far violated as to call for the interposition of the courts. But whenever this has occurred, with the exception of the present cases from Louisiana, which are the most barefaced and flagrant of all, the enactment interfering with the privilege of the citizen has been pronounced illegal and void. When a case under the same law, under which the present cases have arisen, came before the Circuit Court of the United States in the District of Louisiana, there was no hesitation on the part of the court in declaring the law, in its exclusive features, to be an invasion of one of the fundamental privileges of the citizen.* The presiding justice, in delivering the opinion of the court, observed that it might be difficult to enumerate or define what were the essential privileges of a citizen of the United States, which a State could not by its laws invade, but that so far as the question under consideration was concerned, it might be safely said that "it is one of the privileges of every American citizen to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit, without unreasonable regulation or molestation, and without being restricted by any of those unjust, oppressive, and odious monopolies or exclusive privileges which have been condemned by all free governments." And again : "There is no more sacred right of citizenship than the right to pursue unmolested a lawful employment in a lawful manner. It is nothing more nor less than the sacred right of labor."

In the *City of Chicago* v. *Rumpff*,† which was before the Supreme Court of Illinois, we have a case similar in all its

---

* Live-Stock, &c., Association *v.* The Crescent City, &c., Company (1 Abbott's United States Reports, 398).

† 45 Illinois, 90.

features to the one at bar.    That city being authorized by its charter to regulate and license the slaughtering of animals within its corporate limits, the common council passed what was termed an ordinance in reference thereto, whereby a particular building was designated for the slaughtering of all animals intended for sale or consumption in the city, the owners of which were granted the exclusive right for a specified period to have all such animals slaughtered at their establishment, they to be paid a specific sum for the privilege of slaughtering tnere by all persons exercising it.    The validity of this action of the corporate authorities was assailed on the ground of the grant of exclusive privileges, and the court said: "The charter authorizes the city authorities to license or regulate such establishments.    Where that body has made the necessary regulations, required for the health or comfort of the inhabitants, all persons inclined to pursue such an occupation should have an opportunity of conforming to such regulations, otherwise the ordinance would be unreasonable and tend to oppression.    Or, if they should regard it for the interest of the city that such establishments should be licensed, the ordinance should be so framed that all persons desiring it might obtain licenses by conforming to the prescribed terms and regulations for the government of such business.    We regard it neither as a regulation nor a license of the business to confine it to one building or to give it to one individual.    Such an action is oppressive, and creates a monopoly that never could have been contemplated by the General Assembly.    It impairs the rights of all other persons, and cuts them off from a share in not only a legal, but a necessary business.    Whether we consider this as an ordinance or a contract, it is equally unauthorized, as being opposed to the rules governing the adoption of municipal by-laws.    The principle of equality of rights to the corporators is violated by this contract.    If the common council may require all of the animals for the consumption of the city to be slaughtered in a single building, or on a particular lot, and the owner be paid a specific sum for the privilege, what would prevent the making a

similar contract with some other person that all of the vege-
tables, or fruits, the flour, the groceries, the dry goods, or
other commodities should be sold on his lot and he receive
a compensation for the privilege? We can see no difference
in principle."

It is true that the court in this opinion was speaking of a
municipal ordinance and not of an act of the legislature of a
State. But, as it is justly observed by counsel, a legislative
body is no more entitled to destroy the equality of rights of
citizens, nor to fetter the industry of a city, than a municipal
government. These rights are protected from invasion by
the fundamental law.

In the case of the *Norwich Gaslight Company* v. *The Nor-
wich City Gas Company*,\* which was before the Supreme
Court of Connecticut, it appeared that the common council
of the city of Norwich had passed a resolution purporting to
grant to one Treadway, his heirs and assigns, for the period
of fifteen years, the right to lay gas-pipes in the streets of
that city, declaring that no other person or corporation
should, by the consent of the common council, lay gas-pipes
in the streets during that time. The plaintiffs having pur-
chased of Treadway, undertook to assert an exclusive right
to use the streets for their purposes, as against another com-
pany which was using the streets for the same purposes.
And the court said: "As, then, no consideration whatever,
either of a public or private character, was reserved for the
grant; and as the business of manufacturing and selling gas
is an ordinary business, like the manufacture of leather, or
any other article of trade in respect to which the government
has no exclusive prerogative, we think that so far as the re-
striction of other persons than the plaintiffs from using the
streets for the purpose of distributing gas by means of pipes,
can fairly be viewed as intended to operate as a restriction
upon its free manufacture and sale, it comes directly within
the definition and description of a monopoly; and although
we have no direct constitutional provision against a monop-

---

\* 25 Connecticut, 19.

oly, yet the whole theory of a free government is opposed to such grants, and it does not require even the aid which may be derived from the Bill of Rights, the first section of which declares 'that no man or set of men are entitled to exclusive public emoluments or privileges from the community,' to render them void."

In the *Mayor of the City of Hudson* v. *Thorne,** an application was made to the chancellor of New York to dissolve an injunction restraining the defendants from erecting a building in the city of Hudson upon a vacant lot owned by them, intended to be used as a hay-press. The common council of the city had passed an ordinance directing that no person should erect, or construct, or cause to be erected or constructed, any wooden or frame barn, stable, or hay-press of certain dimensions, within certain specified limits in the city, without its permission. It appeared, however, that there were such buildings already in existence, not only in compact parts of the city, but also within the prohibited limits, the occupation of which for the storing and pressing of hay the common council did not intend to restrain. And the chancellor said: "If the manufacture of pressed hay within the compact parts of the city is dangerous in causing or promoting fires, the common council have the power expressly given by their charter to prevent the carrying on of such manufacture; but as all by-laws must be reasonable, the common council cannot make a by-law which shall permit one person to carry on the dangerous business and prohibit another who has an equal right from pursuing the same business."

In all these cases there is a recognition of the equality of right among citizens in the pursuit of the ordinary avocations of life, and a declaration that all grants of exclusive privileges, in contravention of this equality, are against common right, and void.

This equality of right, with exemption from all disparaging and partial enactments, in the lawful pursuits of life,

* 7 Paige, 261.

throughout the whole country, is the distinguishing privilege of citizens of the United States. To them, everywhere, all pursuits, all professions, all avocations are open without other restrictions than such as are imposed equally upon all others of the same age, sex, and condition. The State may prescribe such regulations for every pursuit and calling of life as will promote the public health, secure the good order and advance the general prosperity of society, but when once prescribed, the pursuit or calling must be free to be followed by every citizen who is within the conditions designated, and will conform to the regulations. This is the fundamental idea upon which our institutions rest; and unless adhered to in the legislation of the country our government will be a republic only in name. The fourteenth amendment, in my judgment, makes it essential to the validity of the legislation of every State that this equality of right should be respected. How widely this equality has been departed from, how entirely rejected and trampled upon by the act of Louisiana, I have already shown. And it is to me a matter of profound regret that its validity is recognized by a majority of this court, for by it the right of free labor, one of the most sacred and imprescriptible rights of man, is violated.* As stated by the Supreme Court of Connecticut, in

---

* "The property which every man has in his own labor," says Adam Smith, "as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands ; and to hinder him from employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the others from employing whom they think proper." (Smith's Wealth of Nations, b. 1, ch. 10, part 2.)

In the edict of Louis XVI, in 1776, giving freedom to trades and professions, prepared by his minister, Turgot, he recites the contributions that had been made by the guilds and trade companies, and says : "It was the allurement of these fiscal advantages undoubtedly that prolonged the illusion and concealed the immense injury they did to industry and their infraction of natural right. *This* illusion had extended so far that some persons asserted that the right to work was a royal privilege which the king might

the case cited, grants of exclusive privileges, such as is made by the act in question, are opposed to the whole theory of free government, and it requires no aid from any bill of rights to render them void. That only is a free government, in the American sense of the term, under which the inalienable right of every citizen to pursue his happiness is unrestrained, except by just, equal, and impartial laws.*

I am authorized by the CHIEF JUSTICE, Mr. Justice SWAYNE, and Mr. Justice BRADLEY, to state that they concur with me in this dissenting opinion.

Mr. Justice BRADLEY, also dissenting:

I concur in the opinion which has just been read by Mr. Justice Field; but desire to add a few observations for the purpose of more fully illustrating my views on the important question decided in these cases, and the special grounds on which they rest.

The fourteenth amendment to the Constitution of the United States, section 1, declares that no State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States.

The legislature of Louisiana, under pretence of making a police regulation for the promotion of the public health, passed an act conferring upon a corporation, created by the act, the exclusive right, for twenty-five years, to have and maintain slaughter-houses, landings for cattle, and yards for

---

sell, and that his subjects were bound to purchase from him. We hasten to correct this error and to repel the conclusion. God in giving to man wants and desires rendering labor necessary for their satisfaction, conferred the right to labor upon all men, and this property is the first, most sacred, and imprescriptible of all." . . . He, therefore, regards it " as the first duty of his justice, and the worthiest act of benevolence, to free his subjects from any restriction upon this inalienable right of humanity."

* " Civil liberty, the great end of all human society and government, is that state in which each individual has the power to pursue his own happiness according to his own views of his interest, and the dictates of his conscience, unrestrained, except by equal, just, and impartial laws." (1 Sharswood's Blackstone, 127, note 8.)

confining cattle intended for slaughter, within the parishes of Orleans, Jefferson, and St. Bernard, a territory containing nearly twelve hundred square miles, including the city of New Orleans; and prohibiting all other persons from building, keeping, or having slaughter-houses, landings for cattle, and yards for confining cattle intended for slaughter within the said limits; and requiring that all cattle and other animals to be slaughtered for food in that district should be brought to the slaughter-houses and works of the favored company to be slaughtered, and a payment of a fee to the company for such act.

It is contended that this prohibition abridges the privileges and immunities of citizens of the United States, especially of the plaintiffs in error, who were particularly affected thereby; and whether it does so or not is the simple question in this case. And the solution of this question depends upon the solution of two other questions, to wit:

First. Is it one of the rights and privileges of a citizen of the United States to pursue such civil employment as he may choose to adopt, subject to such reasonable regulations as may be prescribed by law?

Secondly. Is a monopoly, or exclusive right, given to one person to the exclusion of all others, to keep slaughter-houses, in a district of nearly twelve hundred square miles, for the supply of meat for a large city, a reasonable regulation of that employment which the legislature has a right to impose?

The first of these questions is one of vast importance, and lies at the very foundations of our government. The question is now settled by the fourteenth amendment itself, that citizenship of the United States is the primary citizenship in this country; and that State citizenship is secondary and derivative, depending upon citizenship of the United States and the citizen's place of residence. The States have not now, if they ever had, any power to restrict their citizenship to any classes or persons. A citizen of the United States has a perfect constitutional right to go to and reside in any State he chooses, and to claim citizenship therein,

and an equality of rights with every other citizen; and the whole power of the nation is pledged to sustain him in that right. He is not bound to cringe to any superior, or to pray for any act of grace, as a means of enjoying all the rights and privileges enjoyed by other citizens. And when the spirit of lawlessness, mob violence, and sectional hate can be so completely repressed as to give full practical effect to this right, we shall be a happier nation, and a more prosperous one than we now are. Citizenship of the United States ought to be, and, according to the Constitution, is, a sure and undoubted title to equal rights in any and every State in this Union, subject to such regulations as the legislature may rightfully prescribe. If a man be denied full equality before the law, he is denied one of the essential rights of citizenship as a citizen of the United States.

Every citizen, then, being primarily a citizen of the United States, and, secondarily, a citizen of the State where he resides, what, in general, are the privileges and immunites of a citizen of the United States? Is the right, liberty, or privilege of choosing any lawful employment one of them?

If a State legislature should pass a law prohibiting the inhabitants of a particular township, county, or city, from tanning leather or making shoes, would such a law violate any privileges or immunities of those inhabitants as citizens of the United States, or only their privileges and immunities as citizens of that particular State? Or if a State legislature should pass a law of caste, making all trades and professions, or certain enumerated trades and professions, hereditary, so that no one could follow any such trades or professions except that which was pursued by his father, would such a law violate the privileges and immunities of the people of that State as citizens of the United States, or only as citizens of the State? Would they have no redress but to appeal to the courts of that particular State?

This seems to me to be the essential question before us for consideration. And, in my judgment, the right of any citizen to follow whatever lawful employment he chooses to adopt (submitting himself to all lawful regulations) is one of

his most valuable rights, and one which the legislature of. a State cannot invade, whether restrained by its own constitution or not.

The right of a State to regulate the conduct of its citizens is undoubtedly a very broad and extensive one, and not to be lightly restricted. But there are certain fundamental rights which this right of regulation cannot infringe. It may prescribe the manner of their exercise, but it cannot subvert the rights themselves. I speak now of. the rights of citizens of any free government. Granting for the present that the citizens of one government cannot claim the privileges of citizens in another government; that prior to the union of our North American States the citizens of one State could not claim the privileges of citizens in another State; or, that after the union was formed the citizens of the United States, as such, could not claim the privileges of citizens in any particular State; yet the citizens of each of the States and the citizens of the United States would be entitled to certain privileges and immunities as citizens, at the hands of their own government—privileges and immunities which. their own governments respectively would be bound to respect and maintain. In this free country, the people of which inherited certain traditionary rights and privileges from their ancestors, citizenship means something. It has certain privileges and immunities attached to it which the government, whether restricted by express or implied limitations, cannot take away or impair. It may do so temporarily by force, but it cannot do so by right. And these privileges and immunities attach as well to citizenship of the United States as to citizenship of the States.

The people of this country brought with them to its shores the rights of Englishmen; the rights which had been wrested from English sovereigns at various periods of the nation's history. One of these fundamental rights was expressed in these words, found in Magna Charta: "No freeman shall be taken or imprisoned, or be disseized of his freehold or liberties or free customs, or be outlawed or exiled, or any otherwise destroyed; nor will we pass upon him or condemn

him but by lawful judgment of his peers or by the law of the land." English constitutional writers expound this article as rendering life, liberty, and property inviolable, except by due process of law. This is the very right which the plaintiffs in error claim in this case. Another of these rights was that of *habeas corpus*, or the right of having any invasion of personal liberty judicially examined into, at once, by a competent judicial magistrate. Blackstone classifies these fundamental rights under three heads, as the absolute rights of individuals, to wit: the right of personal security, the right of personal liberty, and the right of private property. And of the last he says: "The third absolute right, inherent in every Englishman, is that of property, which consists in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution save only by the laws of the land."

The privileges and immunities of Englishmen were established and secured by long usage and by various acts of Parliament. But it may be said that the Parliament of England has unlimited authority, and might repeal the laws which have from time to time been enacted. Theoretically this is so, but practically it is not. England has no written constitution, it is true; but it has an unwritten one, resting in the acknowledged, and frequently declared, privileges of Parliament and the people, to violate which in any material respect would produce a revolution in an hour. A violation of one of the fundamental principles of that constitution in the Colonies, namely, the principle that recognizes the property of the people as their own, and which, therefore, regards all taxes for the support of government as gifts of the people through their representatives, and regards taxation without representation as subversive of free government, was the origin of our own revolution.

This, it is true, was the violation of a political right; but personal rights were deemed equally sacred, and were claimed by the very first Congress of the Colonies, assembled in 1774, as the undoubted inheritance of the people of this country; and the Declaration of Independence, which

was the first political act of the American people in their independent sovereign capacity, lays the foundation of our National existence upon this broad proposition: "That all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness." Here again we have the great threefold division of the rights of freemen, asserted as the rights of man. Rights to life, liberty, and the pursuit of happiness are equivalent to the rights of life, liberty, and property. These are the fundamental rights which can only be taken away by due process of law, and which can only be interfered with, or the enjoyment of which can only be modified, by lawful regulations necessary or proper for the mutual good of all; and these rights, I contend, belong to the citizens of every free government.

For the preservation, exercise, and enjoyment of these rights the individual citizen, as a necessity, must be left free to adopt such calling, profession, or trade as may seem to him most conducive to that end. Without this right he cannot be a freeman. This right to choose one's calling is an essential part of that liberty which it is the object of government to protect; and a calling, when chosen, is a man's property and right. Liberty and property are not protected where these rights are arbitrarily assailed.

I think sufficient has been said to show that citizenship is not an empty name, but that, in this country at least, it has connected with it certain incidental rights, privileges, and immunities of the greatest importance. And to say that these rights and immunities attach only to State citizenship, and not to citizenship of the United States, appears to me to evince a very narrow and insufficient estimate of constitutional history and the rights of men, not to say the rights of the American people.

On this point the often-quoted language of Mr. Justice Washington, in *Corfield* v. *Coryell*,* is very instructive. Being

---

* 4 Washington, 380.

called upon to expound that clause in the fourth article of the Constitution, which declares that "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States," he says: "The inquiry is, what are the privileges and immunities of citizens in the several States? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, *fundamental;* which belong, of right, to the citizens of all free governments, and which have at all times been enjoyed by the citizens of the several States which compose this Union from the time of their becoming free, independent, and sovereign. What these fundamental privileges are it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may justly prescribe for the general good of the whole; the right of a citizen of one State to pass through, or to reside in, any other State for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of *habeas corpus;* to institute and maintain actions of any kind in the courts of the State; to take, hold, and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the State, may be mentioned as some of the particular privileges and immunities of citizens which are clearly embraced by the general description of privileges deemed to be fundamental."

It is pertinent to observe that both the clause of the Constitution referred to, and Justice Washington in his comment on it, speak of the privileges and immunities of citizens *in* a State; not of citizens *of* a State. It is the privileges and immunities of citizens, that is, of citizens as such, that are to be accorded to citizens of other States when they are found in any State; or, as Justice Washington says, "privileges and immunities which are, in their nature, fundamen-

tal; which belong, of right. to the citizens of all free governments."

It is true the courts have usually regarded the clause referred to as securing only an equality of privileges with the citizens of the State in which the parties are found. Equality before the law is undoubtedly one of the privileges and immunities of every citizen. I am not aware that any case has arisen in which it became necessary to vindicate any other fundamental privilege of citizenship; although rights have been claimed which were not deemed fundamental, and have been rejected as not within the protection of this clause. Be this, however, as it may, the language of the clause is as I have stated it, and seems fairly susceptible of a broader interpretation than that which makes it a guarantee of mere equality of privileges with other citizens.

But we are not bound to resort to implication, or to the constitutional history of England, to find an authoritative declaration of some of the most important privileges and immunities of citizens of the United States. It is in the Constitution itself. The Constitution, it is true, as it stood prior to the recent amendments, specifies, in terms, only a few of the personal privileges and immunities of citizens, but they are very comprehensive in their character. The States were merely prohibited from passing bills of attainder, *ex post facto* laws, laws impairing the obligation of contracts, and perhaps one or two more. But others of the greatest consequence were enumerated, although they were only secured, in express terms, from invasion by the Federal government; such as the right of *habeas corpus*, the right of trial by jury, of free exercise of religious worship, the right of free speech and a free press, the right peaceably to assemble for the discussion of public measures, the right to be secure against unreasonable searches and seizures, and above all, and including almost all the rest, the right of *not being deprived of life, liberty, or property, without due process of law*. These, and still others are specified in the original Constitution, or in the early amendments of it, as among the privileges and im-

munities of citizens of the United States, or, what is still stronger for the force of the argument, the rights of all persons, whether citizens or not.

But even if the Constitution were silent, the fundamental privileges and immunities of citizens, as such, would be no less real and no less inviolable than they now are. It was not necessary to say in words that the citizens of the United States should have and exercise all the privileges of citizens; the privilege of buying, selling, and enjoying property; the privilege of engaging in any lawful employment for a livelihood; the privilege of resorting to the laws for redress of injuries, and the like. Their very citizenship conferred these privileges, if they did not possess them before. And these privileges they would enjoy whether they were citizens of any State or not. Inhabitants of Federal territories and new citizens, made such by annexation of territory or naturalization, though without any status as citizens of a State, could, nevertheless, as citizens of the United States, lay claim to every one of the privileges and immunities which have been enumerated; and among these none is more essential and fundamental than the right to follow such profession or employment as each one may choose, subject only to uniform regulations equally applicable to all.

II. The next question to be determined in this case is: Is a monopoly or exclusive right, given to one person, or corporation, to the exclusion of all others, to keep slaughter-houses in a district of nearly twelve hundred square miles, for the supply of meat for a great city, a reasonable regulation of that employment which the legislature has a right to impose?

The keeping of a slaughter-house is part of, and incidental to, the trade of a butcher—one of the ordinary occupations of human life. To compel a butcher, or rather all the butchers of a large city and an extensive district, to slaughter their cattle in another person's slaughter-house and pay him a toll therefor, is such a restriction upon the trade as materially to interfere with its prosecution. It is onerous, unreasonable, arbitrary, and unjust. It has none of the

qualities of a police regulation.  If it were really a police regulation, it would undoubtedly be within the power of the legislature.  That portion of the act which requires all slaughter-houses to be located below the city, and to be subject to inspection, &c., is clearly a police regulation.  That portion which allows no one but the favored company to build, own, or have slaughter-houses is not a police regulation, and has not the faintest semblance of one.  It is one of those arbitrary and unjust laws made in the interest of a few scheming individuals, by which some of the Southern States have, within the past few years, been so deplorably oppressed and impoverished.  It seems to me strange that it can be viewed in any other light.

The granting of monopolies, or exclusive privileges to individuals or corporations, is an invasion of the right of others to choose a lawful calling, and an infringement of personal liberty.  It was so felt by the English nation as far back as the reigns of Elizabeth and James.  A fierce struggle for the suppression of such monopolies, and for abolishing the prerogative of creating them, was made and was successful.  The statute of 21st James, abolishing monopolies, was one of those constitutional landmarks of English liberty which the English nation so highly prize and so jealously preserve.  It was a part of that inheritance which our fathers brought with them.  This statute abolished all monopolies except grants for a term of years to the inventors of new manufactures.  This exception is the groundwork of patents for new inventions and copyrights of books.  These have always been sustained as beneficial to the state.  But all other monopolies were abolished, as tending to the impoverishment of the people and to interference with their free pursuits.  And ever since that struggle no English-speaking people have ever endured such an odious badge of tyranny.

It has been suggested that this was a mere legislative act, and that the British Parliament, as well as our own legislatures, have frequently disregarded it by granting exclusive privileges for erecting ferries, railroads, markets, and other establishments of a public kind.  It requires but a slight

acquaintance with legal history to know that grants of this kind of franchises are totally different from the monopolies of commodities or of ordinary callings or pursuits. These public franchises can only be exercised under authority from the government, and the government may grant them on such conditions as it sees fit. But even these exclusive privileges are becoming more and more odious, and are getting to be more and more regarded as wrong in principle, and as inimical to the just rights and greatest good of the people. But to cite them as proof of the power of legislatures to create mere monopolies, such as no free and enlightened community any longer endures, appears to me, to say the least, very strange and illogical.

Lastly: Can the Federal courts administer relief to citizens of the United States whose privileges and immunities have been abridged by a State? Of this I entertain no doubt. Prior to the fourteenth amendment this could not be done, except in a few instances, for the want of the requisite authority.

As the great mass of citizens of the United States were also citizens of individual States, many of their general privileges and immunities would be the same in the one capacity as in the other. Having this double citizenship, and the great body of municipal laws intended for the protection of person and property being the laws of the State, and no provision being made, and no machinery provided by the Constitution, except in a few specified cases, for any interference by the General Government between a State and its citizens, the protection of the citizen in the enjoyment of his fundamental privileges and immunities (except where a citizen of one State went into another State) was largely left to State laws and State courts, where they will still continue to be left unless actually invaded by the unconstitutional acts or delinquency of the State governments themselves.

Admitting, therefore, that formerly the States were not prohibited from infringing any of the fundamental privileges and immunities of citizens of the United States, except

in a few specified cases, that cannot be said now, since the adoption of the fourteenth amendment. In my judgment, it was the intention of the people of this country in adopting that amendment to provide National security against violation by the States of the fundamental rights of the citizen.

The first section of this amendment, after declaring that all persons born or naturalized in the United States, and subject to its jurisdiction, are citizens of the United States and of the State wherein they reside, proceeds to declare further, that " no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws;" and that Congress shall have power to enforce by appropriate legislation the provisions of this article.

Now, here is a clear prohibition on the States against making or enforcing any law which shall abridge the privileges or immunities of citizens of the United States.

If my views are correct with regard to what are the privileges and immunities of citizens, it follows conclusively that any law which establishes a sheer monopoly, depriving a large class of citizens of the privilege of pursuing a lawful employment, does abridge the privileges of those citizens.

The amendment also prohibits any State from depriving any person (citizen or otherwise) of life, liberty, or property, without due process of law.

In my view, a law which prohibits a large class of citizens from adopting a lawful employment, or from following a lawful employment previously adopted, does deprive them of liberty as well as property, without due process of law. Their right of choice is a portion of their liberty; their occupation is their property. Such a law also deprives those citizens of the equal protection of the laws, contrary to the last clause of the section.

The constitutional question is distinctly raised in these cases; the constitutional right is expressly claimed; it was

violated by State law, which was sustained by the State court, and we are called upon in a legitimate and proper way to afford redress.    Our jurisdiction and our duty are plain and imperative.

It is futile to argue that none but persons of the African race are intended to be benefited by this amendment.  They may have been the primary cause of the amendment, but its language is general, embracing all citizens, and I think it was purposely so expressed.

The mischief to be remedied was not merely slavery and its incidents and consequences; but that spirit of insubordination and disloyalty to the National government which had troubled the country for so many years in some of the States, and that intolerance of free speech and free discussion which often rendered life and property insecure, and led to much unequal legislation.    The amendment was an attempt to give voice to the strong National yearning for that time and that condition of things, in which American citizenship should be a sure guaranty of safety, and in which every citizen of the United States might stand erect on every portion of its soil, in the full enjoyment of every right and privilege belonging to a freeman, without fear of violence or molestation.

But great fears are expressed that this construction of the amendment will lead to enactments by Congress interfering with the internal affairs of the States, and establishing therein civil and criminal codes of law for the government of the citizens, and thus abolishing the State governments in everything but name; or else, that it will lead the Federal courts to draw to their cognizance the supervision of State tribunals on every subject of judicial inquiry, on the plea of ascertaining whether the privileges and immunities of citizens have not been abridged.

In my judgment no such practical inconveniences would arise.    Very little, if any, legislation on the part of Congress would be required to carry the amendment into effect.    Like the prohibition against passing a law impairing the obligation of a contract, it would execute itself.    The point would

be regularly raised, in a suit at law, and settled by final reference to the Federal court. As the privileges and immunities protected are only those fundamental ones which belong to every citizen, they would soon become so far defined as to cause but a slight accumulation of business in the Federal courts. Besides, the recognized existence of the law would prevent its frequent violation. But even if the business of the National courts should be increased, Congress could easily supply the remedy by increasing their number and efficiency. The great question is, What is the true construction of the amendment? When once we find that, we shall find the means of giving it effect. The argument from inconvenience ought not to have a very controlling influence in questions of this sort. The National will and National interest are of far greater importance.

In my opinion the judgment of the Supreme Court of Louisiana ought to be reversed.

Mr. Justice SWAYNE, dissenting:

I concur in the dissent in these cases and in the views expressed by my brethren, Mr. Justice Field and Mr. Justice Bradley. I desire, however, to submit a few additional remarks.

The first eleven amendments to the Constitution were intended to be checks and limitations upon the government which that instrument called into existence. They had their origin in a spirit of jealousy on the part of the States, which existed when the Constitution was adopted. The first ten were proposed in 1789 by the first Congress at its first session after the organization of the government. The eleventh was proposed in 1794, and the twelfth in 1803. The one last mentioned regulates the mode of electing the President and Vice-President. It neither increased nor diminished the power of the General Government, and may be said in that respect to occupy neutral ground. No further amendments were made until 1865, a period of more than sixty years. The thirteenth amendment was proposed by Congress on the 1st of February, 1865, the fourteenth on

the 16th of June, 1866, and the fifteenth on the 27th of February, 1869. These amendments are a new departure, and mark an important epoch in the constitutional history of the country. They trench directly upon the power of the States, and deeply affect those bodies. They are, in this respect, at the opposite pole from the first eleven.*

Fairly construed these amendments may be said to rise to the dignity of a new Magna Charta. The thirteenth blotted out slavery and forbade forever its restoration. It struck the fetters from four millions of human beings and raised them at once to the sphere of freemen. This was an act of grace and justice performed by the Nation. Before the war it could have been done only by the States where the institution existed, acting severally and separately from each other. The power then rested wholly with them. In that way, apparently, such a result could never have occurred. The power of Congress did not extend to the subject, except in the Territories.

The fourteenth amendment consists of five sections. The first is as follows: " All persons born or naturalized within the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The fifth section declares that Congress shall have power to enforce the provisions of this amendment by appropriate legislation.

The fifteenth amendment declares that the right to vote shall not be denied or abridged by the United States, or by any State, on account of race, color, or previous condition of servitude. Until this amendment was adopted the sub-

---

* Barron v. Baltimore, 7 Peters, 243; Livingston v. Moore, Ib. 551; Fox v. Ohio, 5 Howard, 429; Smith v. Maryland, 18 Id. 71; Pervear v. Commonwealth, 5 Wallace, 476; Twitchell v Commonwealth, 7 Id. 321.

ject to which it relates was wholly within the jurisdiction of the States. The General Government was excluded from participation.

The first section of the fourteenth amendment is alone involved in the consideration of these cases. No searching analysis is necessary to eliminate its meaning. Its language is intelligible and direct. Nothing can be more transparent. Every word employed has an established signification. There is no room for construction. There is nothing to construe. Elaboration may obscure, but cannot make clearer, the intent and purpose sought to be carried out.

(1.) Citizens of the States and of the United States are defined.

(2.) It is declared that no State shall, by law, abridge the privileges or immunities of citizens of the United States.

(3.) That no State shall deprive *any person*, whether a citizen or not, of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

A citizen of a State is *ipso facto* a citizen of the United States. No one can be the former without being also the latter; but the latter, by losing his residence in one State without acquiring it in another, although he continues to be the latter, ceases for the time to be the former. " The privileges and immunities " of a citizen of the United States include, among other things, the fundamental rights of life, liberty, and property, and also the rights which pertain to him by reason of his membership of the Nation. The citizen of a State has the same fundamental rights as a citizen of the United States, and also certain others, local in their character, arising from his relation to the State, and in addition, those which belong to the citizen of the United States, he being in that relation also. There may thus be a double citizenship, each having some rights peculiar to itself. It is only over those which belong to the citizen of the United States that the category here in question throws the shield of its protection. All those which belong to the citizen of a State, except as to bills of attainder, *ex post facto*

laws, and laws impairing the obligation of contracts,* are left to the guardianship of the bills of rights, constitutions, and laws of the States respectively. Those rights may all be enjoyed in every State by the citizens of every other State by virtue of clause 2, section 4, article 1, of the Constitution of the United States as it was originally framed. This section does not in anywise affect them; such was not its purpose.

In the next category, obviously *ex industriâ*, to prevent, as far as may be, the possibility of misinterpretation, either as to persons or things, the phrases "citizens of the United States" and "privileges and immunities" are dropped, and more simple and comprehensive terms are substituted. The substitutes are "any person," and "life," "liberty," and "property," and "the equal protection of the laws." Life, liberty, and property are forbidden to be taken "without due process of law," and "equal protection of the laws" is guaranteed to all. Life is the gift of God, and the right to preserve it is the most sacred of the rights of man. Liberty is freedom from all restraints but such as are justly imposed by law. Beyond that line lies the domain of usurpation and tyranny. Property is everything which has an exchangeable value, and the right of property includes the power to dispose of it according to the will of the owner. Labor is property, and as such merits protection. The right to make it available is next in importance to the rights of life and liberty. It lies to a large extent at the foundation of most other forms of property, and of all solid individual and national prosperity. "Due process of law" is the application of the law as it exists in the fair and regular course of administrative procedure. "The equal protection of the laws" places all upon a footing of legal equality and gives the same protection to all for the preservation of life, liberty, and property, and the pursuit of happiness.†

---

* Constitution of the United States, Article I, Section 10.

† Corfield v. Coryell, 4 Washington, 380; Lemmon v. The People, 26 Barbour, 274, and 20 New York, 626; Conner v. Elliott, 18 Howard, 593; Murray v. McCarty, 2 Mumford, 399; Campbell v. Morris, 3 Harris &

It is admitted that the plaintiffs in error are citizens of the United States, and persons within the jurisdiction of Louisiana. The cases before us, therefore, present but two questions.

(1.) Does the act of the legislature creating the monopoly in question abridge the privileges and immunities of the plaintiffs in error as citizens of the United States?

(2.) Does it deprive them of liberty or property without due process of law, or deny them the equal protection of the laws of the State, they being *persons* " within its jurisdiction?"

Both these inquiries I remit for their answer as to the facts to the opinions of my brethren, Mr. Justice Field and Mr. Justice Bradley. They are full and conclusive upon the subject. A more flagrant and indefensible invasion of the rights of many for the benefit of a few has not occurred in the legislative history of the country. The response to both inquiries should be in the affirmative. In my opinion the cases, as presented in the record, are clearly within the letter and meaning of both the negative categories of the sixth section. The judgments before us should, therefore, be reversed.

These amendments are all consequences of the late civil war. The prejudices and apprehension as to the central government which prevailed when the Constitution was adopted were dispelled by the light of experience. The public mind became satisfied that there was less danger of tyranny in the head than of anarchy and tyranny in the members. The provisions of this section are all eminently conservative in their character. They are a bulwark of defence, and can never be made an engine of oppression. The language employed is unqualified in its scope. There is no exception in its terms, and there can be properly none in their application. By the language " citizens of the United States " was meant *all* such citizens; and by " any person "

McHenry, 554; Towles's Case, 5 Leigh, 748; State *v.* Medbury, 3 Rhode Island, 142; 1 Tucker's Blackstone, 145; 1 Cooley's Blackstone, 125, 128.

was meant *all* persons within the jurisdiction of the State. No distinction is intimated on account of race or color. This court has no authority to interpolate a limitation that is neither expressed nor implied. Our duty is to execute the law, not to make it. The protection provided was not intended to be confined to those of any particular race or class, but to embrace equally all races, classes, and conditions of men. It is objected that the power conferred is novel and large. The answer is that the novelty was known and the measure deliberately adopted. The power is beneficent in its nature, and cannot be abused. It is such as should exist in every well-ordered system of polity. Where could it be more appropriately lodged than in the hands to which it is confided? It is necessary to enable the government of the nation to secure to every one within its jurisdiction the rights and privileges enumerated, which, according to the plainest considerations of reason and justice and the fundamental principles of the social compact, all are entitled to enjoy. Without such authority any government claiming to be national is glaringly defective. The construction adopted by the majority of my brethren is, in my judgment, much too narrow. It defeats, by a limitation not anticipated, the intent of those by whom the instrument was framed and of those by whom it was adopted. To the extent of that limitation it turns, as it were, what was meant for bread into a stone. By the Constitution, as it stood before the war, ample protection was given against oppression by the Union, but little was given against wrong and oppression by the States. That want was intended to be supplied by this amendment. Against the former this court has been called upon more than once to interpose. Authority of the same amplitude was intended to be conferred as to the latter. But this arm of our jurisdiction is, in these cases, stricken down by the judgment just given. Nowhere, than in this court, ought the will of the nation, as thus expressed, to be more liberally construed or more cordially executed. This determination of the majority seems to me to lie far in the other direction.

I earnestly hope that the consequences to follow may prove less serious and far-reaching than the minority fear they will be.

